235 P.3d 1089

Jennifer Lee-Renee WEND, Petitionerv.The PEOPLE of the State of Colorado, Respondent.

No. 09SC478.
Supreme Court of Colorado,
En Banc.
June 28, 2010.
Rehearing Denied Aug. 16, 2010.* COPYRIGHT MATERIAL OMITTED
Lisa Weisz, Boulder, CO, for Petitioner.
John W. Suthers, Attorney General, Katherine A. Hansen, Assistant Attorney General, Appellate Division, Criminal Justice Section, Denver, CO, for Respondent.
Justice RICE delivered the Opinion of the Court. We granted certiorari in this case to review the court of appeals' conclusion in an unpublished decision that, although the prosecutor improperly used the word “lie” in opening and closing statements, there was no reversible error. We agree that use of the word “lie” or any of its other forms is categorically improper according to our precedent. However, we hold that because the prosecutor repeatedly stressed the word “lie” in a trial in which the defendant's credibility was essential to the defense, the prosecutor's conduct prejudiced the fundamental fairness of the trial and constituted reversible plain error. Therefore, we reverse and return to the court of appeals with directions to remand for a new trial.
I. Facts of the Case This appeal stems from a shooting in the home of the victim, Michael Adamson, in the early morning of Christmas Day, 2002. The defendant, Jennifer Lee-Renee Wend, had been staying with Adamson in his home for a few months, occupying a room across the hall from him. The defense alleged that Adamson sought sex in return for allowing Wend to reside in his home and that this demand coupled with escalating methamphetamine use made the relationship between Adamson and Wend increasingly tumultuous in late 2002. In any case, witnesses testified that Wend felt threatened by Adamson prior to the shooting but never moved out of the home. Both Wend and Adamson were frequent methamphetamine users, and both were apparently high at the time of the shooting. It is uncontested that sometime after midnight on Christmas Day, Wend shot Adamson once in the stomach. Wend claimed at trial that Adamson made threatening gestures with a gun towards both her and her dog and that she shot him in self-defense. Adamson then 
 managed to crawl across the hall to his room, where he collapsed and died shortly thereafter. Blood from the shooting remained in both Wend's and Adamson's rooms for many days, including a large pool on Adamson's bedroom floor, until police executed a search warrant on the premises. Wend never contacted the police. Along with a friend, Randy Anderson, Wend disposed of the body some days after the shooting by putting it in an empty refrigerator and leaving it in a dump yard outside Castle Rock, Colorado. Days later, Anderson agreed to plead guilty to an accomplice charge in exchange for locating the body and testifying for the State. When police called Wend for questioning regarding the disappearance of Adamson, she initially denied any knowledge of his whereabouts. Police interrogated Wend on January 3, 2003, but they let her go after she claimed to have no helpful information about Adamson. After Anderson eventually told the police about the body and how he assisted Wend in covering up the killing, police arrested Wend on January 17, 2003. During a second round of interrogation on the 17th, Wend initially denied any knowledge of the shooting, then briefly tried to blame Anderson for killing Adamson, and finally changed stories and admitted to shooting Adamson in self-defense.
II. The Trial The State charged Wend with first-degree murder under section 18-3-102, C.R.S. (2003). Wend argued at trial that she acted in self-defense when she shot Adamson. We granted certiorari specifically on the issue of “whether prosecutorial misconduct warrants reversal,” so only the instances from the trial related to that issue are discussed herein. Of specific concern to us is the prosecutor's repeated use of the word “lie” in opening and closing statements. In his opening, the prosecutor mentioned Detective Derek Graham's videotaped interrogation of Wend,1 predicting to the jury that “you'll hear lie after lie after lie after lie from Jennifer Wend about what happened to Michael Adamson.” Later in opening, the prosecutor stated, “for about the first half of [the interrogation video,] same lies, same lies.” It should be noted that defense counsel also used the word “lie” regarding the interrogation during his opening statement, saying, “[Wend] does lie to people about what happened to Michael Adamson. She lies because she's afraid of what's going to happen to her if she tells the truth.” Defense counsel again observed throughout his closing statement that Wend had “lied,” but his comments, which merely acknowledged the fact that Wend had changed her story, ostensibly attempted to mitigate the damage from the interrogation video that the prosecution had dissected in great detail with Detective Graham during trial. In his closing statement, the prosecutor began by telling the jury:
“I shot him.” “I haven't been honest with you from the beginning.” “I'm the one 
 who shot him.” January the 17th, 2003, the defendant tells that to Detective Derek Graham after weeks of games, calling back and forth, of lies and lies and lies and lies. You could hardly keep count of all the lies told in two interviews, one on January 3, soon after she had moved out finally, and then all the lies in the second interview.
The prosecutor continued by paraphrasing more of Wend's misleading comments during the investigatory stage, observing that not just the police but also witnesses “heard these lies, too.” Later in his closing, he stated that “the defendant realized she couldn't keep lying to [Detective Derek] Graham. You see, Derek wasn't gonna give up. Derek didn't have skeletons in his closet, like methamphetamine use.” The prosecution also posited that Wend, after she confessed during the second interrogation, suddenly relaxed and figured that “they're buying this self-defense story” and then cried “crocodile tears.” 2 In the middle of the closing statement, there is further evidence of the prosecutor's careless use of language. The prosecutor stated:
The people propose that the defendant was at least waist deep in denial, if not over her head. Around about the second of this year Randy [Anderson] knows he got money from the defendant for his rent, about 400 bucks. And on the third he knows he put the body in that refrigerator. Oh, but on the third the defendant couldn't get a hold of Randy. Why was that? Let's see, he was in Missouri. Yeah, that's it, he's in Missouri. Oh, and Randy did it. Yeah, yeah, Randy.
The fucking liar. That Randy, selling her out like everybody else. Randy knows he was in Sedalia. He knows he returned to the dump.
(Emphasis added). It is difficult to surmise from the cold record whether the prosecution was haphazardly attempting to quote Wend in calling her accomplice Randy a “fucking liar.” In the video of Wend's confession, she often swears and at one point says “Randy's a fuckin' liar” when told that he had confessed. Regardless of the object of the prosecutor's ambiguous comment, the term “fucking liar” in a closing statement is certainly of concern. Wend did not contemporaneously object to any of these comments in the trial court.
III. Procedural Posture The instant appeal is actually the second appeal in this case. The prosecution initially charged Wend with first-degree murder, a class-one felony, but the jury returned a guilty verdict for second-degree murder without heat of passion, a class-two felony. Wend appealed that initial judgment to the court of appeals, which found reversible error because of a flawed jury instruction in an unpublished opinion in 2006. In this first opinion, the court of appeals left other appellate issues undecided because its judgment on the jury instructions was dispositive.3 Initially, the court of appeals ordered a new trial but, after a petition for rehearing by the prosecution, modified its judgment to allow the prosecution to elect between either retrying the case or accepting a judgment for second-degree murder by provocation, a class-three felony. Wend responded by requesting a rehearing contesting the modification, but she did not request that any of the other issues she initially raised on appeal be reheard. The court of appeals denied the request. Wend then petitioned this court for certiorari, which was also denied. Wend then filed a motion with the court of appeals demanding reconsideration, but this too was denied. After all appeals were exhausted, the prosecution accepted the lesser second-degree murder by provocation charge, § 18-3-103(1), (3)(b), C.R.S. (2003), and the trial court entered the new conviction, sentencing Wend to thirty-six years.
 In 2007, Wend appealed this new entry of judgment to the court of appeals, raising a myriad of issues including prosecutorial misconduct. In this second appeal, the court of appeals held that the prosecutor's use of the word “lie” was improper but was a fair descriptor for what both parties admitted were, in fact, lies. Moreover, the court believed that the prosecutor's statements were not designed to inflame the passions of the jury, meaning there was no unfair prejudice from the statements. Hence, although the court recognized the error in the prosecution's use of the word “lie,” it found no reversible plain error. This appeal followed.
IV. Waiver The State contends that Wend waived her right to appeal prosecutorial misconduct by failing to raise the issue as part of her first direct appeal. The State accurately observes that in her first direct appeal Wend failed to challenge the prosecutor's use of the word “lie” throughout opening and closing statements, but that is not fatal to this appeal for three reasons. First, the court of appeals refused to address many of the issues Wend raised in the first appeal because they became moot when the court of appeals remanded for a new trial (before later amending its judgment to allow the State to accept a different, lesser murder charge). Next, instead of a mere resentencing in the trial court after the first appeal, the court of appeals entirely vacated the original conviction, meaning the trial court technically convicted Wend of a new crime prior to the second appeal. Finally, our shift towards a categorical prohibition against prosecutorial use of the word “lie” postdates Wend's initial appeal, so the change in our constitutional jurisprudence justifies this later appeal. “Every person convicted of an offense under the statutes of this state has the right of appeal to review the proceedings resulting in conviction.” § 16-12-101, C.R.S. (2009). This right to appeal is fundamental to our system, so “we construe the rules liberally and disfavor interpretations that work a forfeiture of that right.”
Peterson v. People, 113 P.3d 706, 708 (Colo.2005). Similarly, we have held that “courts are reluctant to permit an appeal to fail where there has been no culpable fault, although there may have been some errors or irregularities.”
Wigton v. Wigton, 69 Colo. 19, 22, 169 P. 133, 134 (1917). Hence, precedent demands we review this waiver issue with all doubts resolved in favor of preserving the appellate right.
Peterson, 113 P.3d at 708;
Wigton, 69 Colo. at 22, 169 P. at 134. Wend's conviction for second-degree murder by provocation has had no opportunity for appeal as yet. If we were to deny Wend's right to this second appeal, it would unacceptably deny her the ability to appeal many facets of her criminal conviction that the court of appeals refused to address. The court of appeals in the first appeal did not consider any issue besides the jury instruction (on which it initially vacated the judgment and remanded for a new trial) and the evidentiary questions that would foreseeably impact the new trial. The court of appeals' decision to avoid other trial issues because it was vacating that trial anyway makes logical sense, but it became problematic when the court later modified its judgment to allow the State to accept a lesser charge based on the same original trial. The modification essentially circumvented Wend's right to appeal all other issues arising in the first trial. Thus, this second appeal after the trial court's conviction on the lesser charge is absolutely necessary to protect Wend's fundamental right to appeal. Next, because the court of appeals vacated the initial conviction for second-degree murder without heat of passion, this appeal is the first after entry of a new conviction for second-degree murder by provocation. Again, section 16-12-101 guarantees the right “to review the proceedings resulting in conviction,” and the conviction at the heart of the instant appeal has had no opportunity for appellate review. While the difference between this appeal and the first is largely procedural because both convictions stem from the same trial, that does not change the fact that new standards and elements attach to this new crime and conviction. We recognize a fundamental right to appeal every criminal conviction; thus, we must recognize the right to appeal this new conviction.
 A new conviction, instead of a mere resentencing, distinguishes the instant case from those cited by the State. For instance, in
United States v. Fiallo-Jacome, the Eleventh Circuit denied the defendant's second attempt at appeal after the trial court had resentenced him to correct a double-jeopardy error in the first sentencing. 874 F.2d 1479, 1480-82 (11th Cir.1989). In other words, since the flaw was in the sentencing process, the appellate court remanded for resentencing on the same conviction, and the trial court simply adjusted the sentence without reconsidering the original conviction.
Id. Similarly, in
People v. Senior, a California appellate court in a first appeal “affirmed the defendant's convictions but ordered resentencing.” 33 Cal.App.4th 531, 41 Cal.Rptr.2d 1, 2 (1995). The defendant then tried to challenge the resentencing in another appeal, but the court of appeals denied a second appeal that would have issued from the same conviction.
Id. at 538, 41 Cal.Rptr.2d 1. In this case, the court of appeals entirely vacated the conviction in the first appeal, which distinguishes it from cases where the second appeal issued from the very same conviction. Finally, the cases that have commented on this issue recognize an exception where the first appeal could not have included the new issue in good faith. The
Senior court summarized the general rule when it held: “where a criminal defendant could have raised an issue in a prior appeal, the appellate court need not entertain the issue in a subsequent appeal
absent a showing of justification for the delay.” 41 Cal.Rptr.2d at 5 (emphasis added). The court cautioned against applying its holding too broadly, however, observing that “[t]here are many circumstances-too numerous to contemplate-where legitimate appellate issues arise in the trial court following an appeal and remand.”
Id. Similarly, the Fifth and Eleventh Circuits have both recognized that there are situations where a defendant may get “two bites at the appellate apple.”
Fiallo-Jacome, 874 F.2d at 1482 (denying a second appeal when there was merely a resentencing);
United States v. Williams, 679 F.2d 504, 507 (5th Cir.1982) (upholding a second appeal when the procedural posture of the case changed after the court of appeals vacated the defendant's not-guilty verdict).
 Section 16-12-101 guarantees a defendant only a single appeal when an issue could have been raised on the first appeal after a conviction, unless a significant change in the underlying facts or applicable law justifies subsequent appeals. As applied here, not only did Wend's appeal issue from a new conviction after her first appeal was cut short, but also there has been a significant change in the applicable law regarding use of the word “lie” since her first appeal. As detailed in the following section, we have shifted towards a categorical prohibition against a prosecutor's use of the word “lie” in any context. Although we have previously held that “it is improper for counsel to express his or her personal belief in the truth or falsity of testimony during final argument,”
Wilson v. People, 743 P.2d 415, 418 (Colo.1987), we had not recognized a categorical prohibition applying to all prosecutorial statements in all contexts until 2005 with
Domingo-Gomez v. People, 125 P.3d 1043, 1050-51 (Colo.2005), and 2008 with
Crider v. People, 186 P.3d 39, 41-42 (Colo.2008). In
Crider we observed that “some case law in the jurisdiction had, until very recently, appeared to sanction the characterization of witness testimony as a lie, as long as the attorney's argument was related to specific evidence that tended to demonstrate that to be the case.” 4Id. at 42. At the time of Wend's first appeal, court of appeals' opinions sanctioning the use of the word “lie” were still good, current precedent.
Domingo-Gomez and
Crider, both of which overruled such precedent with a categorical rule, postdated Wend's first appeal. Thus, 
the cases constituted a significant change in the applicable law and merit a fresh appeal after the second conviction. For these reasons, we find that Wend has not waived the right to appeal the issue of prosecutorial misconduct in this instance.
V. Prosecutorial Misconduct
A. The Analytical Framework “A prosecutor, while free to strike hard blows, is not at liberty to strike foul ones.”
Domingo-Gomez, 125 P.3d at 1048 (quoting
Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). We granted certiorari in this case to determine whether the prosecutor's actions during the trial, specifically his repeated use of the word “lie” in opening and closing statements, were foul blows that violated Wend's rights to due process and a fair trial by an impartial jury. We hold that, despite Wend's failure to object at trial, the prosecutor's actions, when evaluated on the totality of the circumstances, were so improper and egregious in this case that they constitute reversible plain error. In a claim of prosecutorial misconduct, the reviewing court engages in a two-step analysis.
Domingo-Gomez, 125 P.3d at 1048. First, it must determine whether the prosecutor's questionable conduct was improper based on the totality of the circumstances and, second, whether such actions warrant reversal according to the proper standard of review.
Id. Each step is analytically independent of the other. Thus, an appellate court could find a prosecutor's conduct improper, but it could uphold the trial court's verdict because the errors were harmless.
See, e.g., 
id. at 1054-55.
B. The Comments Were Improper The first step in appellate review of prosecutorial misconduct asks if the prosecutor's actions were in fact improper. We have recently held that prosecutorial use of the word “lie” and the various forms of “lie” are categorically improper.
Compare 
Crider, 186 P.3d at 41-42,
and 
Domingo-Gomez, 125 P.3d at 1050-51 (both explicitly holding that there is a categorical prohibition against using the word “lie”),
with 
Harris v. People, 888 P.2d 259, 263-64 (Colo.1995),
and 
Wilson, 743 P.2d at 418-19 (both stating a broad test for prosecutorial misconduct that could find using the word “lie” improper but stopping short of explicitly stating a categorical rule prohibiting it). The prohibition stems from the right to a fair trial by an impartial jury guaranteed by the Sixth Amendment of the United States Constitution and article II, sections 16 and 23 of the Colorado Constitution.
See 
Harris, 888 P.2d at 263. We have observed that
[t]he word “lie” is such a strong expression that it necessarily reflects the personal opinion of the speaker. When spoken by the State's representative in the courtroom, the word “lie” has the dangerous potential of swaying the jury from their duty to determine the accused's guilt or innocence on the evidence properly presented at trial.
Domingo-Gomez, 125 P.3d at 1050. Just three years later, we again explained that the word “lie”
is prohibited not only because it poses a risk of communicating the lawyer's personal opinion about the veracity of a witness and implying that the lawyer is privy to information not before the jury, but also simply because the word “lie” is an inflammatory term, likely (whether or not actually designed) to evoke strong and negative emotional reactions against the witness.
Crider, 186 P.3d at 41. For these reasons, we again emphasize that a prosecutor acts improperly when using any form of the word “lie” in reference to a witness's or defendant's veracity. Thus, we hold that the prosecutor in this case acted improperly each time he used the words “lies,” “lied,” and “liar” in relation to the defendant Wend.
C. The Comments Warrant Reversal According to Plain Error Review
 The responsibility for judging the effect of a prosecutor's improper actions first falls to the trial court, for the trial judge is in the best position to assess potential prejudicial impact.
See Harris, 888 P.2d at 265. 
On appeal, a reviewing court may conduct its own review of the record and, if necessary to prevent injustice, order a new trial.
Id. A deferential standard of review applies, but the analysis remains subject to the maxim that “the trial court is best positioned to evaluate whether any statements made by counsel affected the jury's verdict.”
Domingo-Gomez, 125 P.3d at 1049-50. In determining whether to reverse for prosecutorial impropriety, the standard of review varies depending on the circumstances and requires the appellate court to proceed through multiple analytical steps. First, error automatically warrants reversal only if “the error is structural, affecting the very framework within which the trial proceeds.”
Arteaga-Lansaw v. People, 159 P.3d 107, 110 (Colo.2007). Such structural errors directly impinge upon a defendant's right to a fair trial and cannot be permitted in any circumstances.
Id. There is no structural error, however, when the prosecutor mistakenly oversteps the bounds of proper advocacy but does not influence the actual framework of the trial, so there is no structural error here. We are also particularly attuned to errors that directly prejudice a defendant's constitutional rights. Although any prosecutorial error can implicitly affect a defendant's right to a fair trial, we refuse to impose any broad rule finding all prosecutorial misconduct to be of constitutional magnitude.
Crider, 186 P.3d at 42. Instead, we follow U.S. Supreme Court jurisprudence and hold that only errors that specifically and directly offend a defendant's constitutional rights are “constitutional” in nature.
See 
Chapman v. California, 386 U.S. 18, 24-25, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (applying a “harmless beyond a reasonable doubt” test for constitutional errors). For instance, “impermissible comment on a defendant's exercise of a specific constitutional right, such as his right not to testify, his right to be tried by a jury, or his right to post-arrest silence, have been addressed as constitutional error.”
Crider, 186 P.3d at 42 (citations omitted). Because the word “lie” as used here impermissibly affected the impartiality of the jury but did not directly impact Wend's constitutional rights, this is not a case of constitutional error.
See id.; see also 
id. at 45 (Bender, J., dissenting). When the misconduct fails to reach constitutional magnitude, the next step in our analytical framework asks if there was a contemporaneous objection at trial.
See 
Domingo-Gomez, 125 P.3d at 1053. If defense counsel registered an objection at trial, we subject the error to general harmless error review.
Crider, 186 P.3d at 43. If there is no contemporaneous objection to the statement, a plain error standard of review applies.
Domingo-Gomez, 125 P.3d at 1053;
Harris, 888 P.2d at 267;
Wilson, 743 P.2d at 419;
see also Crim. P. 52(b). Here, Wend did not object to the opening or closing statements, so we apply a plain error standard of review.5 Plain error review maximizes deference to the trial court, but it does not excuse the appellate court from its responsibility to address errors that prejudice the defendant. To apply the plain error standard, “[a] reviewing appellate court must inquire into whether the errors seriously affected the fairness or integrity of the trial.”
Domingo-Gomez, 125 P.3d at 1053 (“Only prosecutorial misconduct which is flagrantly, glaringly, or tremendously improper warrants reversal.” (internal citations omitted)). While “[t]he lack of an objection may demonstrate defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging,”
People v. Rodriguez, 794 P.2d 965, 972 (Colo.1990), such deference must be tempered to allow an appellate court to correct particularly egregious errors.
Wilson, 743 P.2d at 420. For, above all, it is the appellate court's responsibility to avoid a miscarriage of justice for a defendant even when defense counsel seriously lapses at trial.
See United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Ensuring fundamental fairness in trial is the beacon of plain error review.
Id.; Wilson, 743 P.2d at 419-20 (and cases cited therein). Thus, plain error review depends on the particular facts and context of the given case, because only through an examination of the totality of the circumstances can the appellate court deduce whether error affected the fundamental fairness of the trial.
Crider, 186 P.3d at 43;
Domingo-Gomez, 125 P.3d at 1053. We focus on the cumulative effect of the prosecutor's statements using factors including the exact language used, the nature of the misconduct, the degree of prejudice associated with the misconduct, the surrounding context, and the strength of the other evidence of guilt.
Crider, 186 P.3d at 43;
Domingo-Gomez, 125 P.3d at 1053. Using these factors to guide our plain error review here, we find the exact language used-specifically the words “lies,” “lied,” and “liar”-to be obviously deficient. The context surrounding the statements failed to mitigate their impact in any substantial way because the prosecutor continually stressed the theme that Wend simply could not be trusted. While the other evidence against Wend clearly indicates that she shot Adamson, that fact is not disputed as Wend has argued self-defense-a defense that depends largely on the defendant's credibility in the eyes of the jury. Thus, the prosecutor's personal attacks on the defendant's veracity represent a heightened degree of prejudice because the prosecution, with its inflammatory and extraneous language, improperly led the jury to distrust Wend. The cumulative effect of these factors calls into question the fundamental fairness of a jury verdict against Wend. We have applied plain error review to instances of prosecutorial misconduct before, and these cases inform our opinion today. This court in
Domingo-Gomez found no plain error despite improper prosecutorial conduct during trial. 125 P.3d at 1055. In his closing statement, the prosecutor stated that the defendant and other defense witnesses had “lied.”
Id. at 1050. The trial judge immediately responded by sustaining his own objection and informing the jury to disregard the prosecutor's statement.
Id. The prosecutor rephrased his argument, stating that the defendant “did not tell you the truth.”
Id. at 1051. Furthermore, the prosecutor alluded to a “screening process for charging cases” that ensured that only strong cases went to trial.
Id. at 1052. We held that all of these actions constituted prosecutorial misconduct but determined that the cumulative effect fell short of plain error.
Id. at 1055. We based our conclusion on four factors: (1) “[t]he trial court eradicated the prejudicial effect of the prosecutor's use of the word ‘lied’ by sustaining the judge's own objection to the word's use”; (2) the prosecutor used “weaker” language like “did not tell you the truth” in the other improper statements; (3) the context surrounding the “screening process” comment mitigated its effect; and (4) the defense counsel failed to object.
Id. at 1054. Three of those four factors are absent as applied to Wend. Only the failure to object parallels this case, but under closer examination the circumstances surrounding the failure are quite different. After the one instance in
Domingo-Gomez when the prosecutor said that the defendant “lied,” objection by defense counsel was unnecessary and would have been rendered moot by the trial judge's decision to immediately object and offer curative instructions himself. And the “did not tell you the truth” comment quickly followed the judge's sua sponte objection, so it was quite reasonable for defense counsel to assume that the judge would address inappropriate comments if necessary. More importantly, none of the other three factors so important in
Domingo-Gomez exist in any form here. There was no “weaker” language like “did not tell you the truth” in the Wend opening and closing statements. There was no context surrounding the statements that could ameliorate the prejudicial impact of repeating the word “lie.” Although defense counsel also used the word, he did so only in response to the interrogation video, which the prosecution had stressed throughout the trial and repeatedly raised in opening and closing statements. Moreover, there certainly was no sua sponte objection or curative instruction to minimize the impact of a statement like “you'll hear lie after lie after 
 lie after lie from Jennifer Wend.” Thus, contrasting
Domingo-Gomez with this case highlights exactly when plain error review does or does not require a mistrial. Conversely, in
Wilson, sexual assault charges depended primarily on conflicting testimony from the victim, the defendant, and the defendant's wife. 743 P.2d at 420-21. Throughout closing arguments, the prosecutor flatly stated that the defendant and his wife had lied in testimony.
Id. at 417. Because there was no contemporaneous objection, we applied a plain error standard of review, concluding that the prosecutor's comments “so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction.”
Id. at 421. We concluded that, despite a jury instruction noting that the jury should make all conclusions about truthfulness itself, there was plain error in not addressing the prosecutor's use of the word “lie.”
Id. We emphasized that the issue of credibility was particularly crucial in a sexual assault charge pitting the defendant's word against the victim's.
Id. at 420. An obvious analogy can be made to the claim of self-defense at issue in this case because it too depends on the jury believing the defendant. Again, the beacon of plain error review must be to ensure “basic fairness” in the trial and the resulting conviction.
Wilson, 743 P.2d at 419-20. As we have already held in
Wilson, the State calling the defendant a liar particularly offends “basic fairness” in any trial where the defendant's credibility is an integral part of the defense strategy.
Id. Although plain error review affords considerable deference, we will not blindly cling to such deference in order to uphold an unjust conviction where prosecutorial misconduct has contaminated the jury's impartiality. In this case, the improper conduct permeated the opening and closing statements,6 making its cumulative effect on the jury all the worse. The prosecutor predicted in his opening statement that “you'll hear lie after lie after lie after lie from Jennifer Wend.” Unlike defense counsel's use of “lie” only in relation to the interrogation video, the prosecutor's statement opened the trial by informing jurors that the defendant would tell “lie after lie after lie after lie,” which implicitly would include her entire self-defense story. Such indiscriminate use of the word was even more pervasive in the closing statement with comments like “[Wend] does lie,” “the defendant [confessed] ... after weeks of games, ... of lies and lies and lies and lies,” “all the lies in the second interview,” and “the defendant realized she couldn't keep lying.” Finally, there was the imprecise language in the closing statement when the prosecutor said, “That fucking liar.” The reference is unclear at best, but the prejudicial impact of such imprecise and sloppy use of language is apparent regardless of the intent behind it. Repeatedly invoking the words “lies,” “lied,” and “liar” on behalf of the State and in relation to the defendant in a case largely dependent on the defendant's credibility undoubtedly affects the jury's impartiality, which in turn corrupts the fundamental fairness of the trial.
VI. Conclusion Because the prosecutor's improper statements pervaded the opening and closing statements, we find that the totality of the circumstances demonstrates that the prosecutorial misconduct affected the basic fairness of the trial. We reverse the court of appeals' decision and return the case with directions to remand for a new trial.
Justice EID dissents, and Justice COATS joins in the dissent.
Justice EID, dissenting. I agree with the majority that the prosecution violated our categorical rule against the use of the word “lie,” but disagree with the majority that the prosecution's use of the word in this case constitutes plain error. Here, Wend admitted that she had lied to the police regarding the victim's whereabouts, and her counsel, both during opening and closing statements, repeatedly referred to the fact that she had “lied.” Under the circumstances, the prosecutor's statements did not so undermine the fundamental fairness of the trial as to warrant the “drastic remedy of reversal under the plain error standard.”
Domingo-Gomez v. People, 125 P.3d 1043, 1055 (Colo.2005). Accordingly, I respectfully dissent from the majority's opinion. Wend initially told police investigators that after arguing with her on Christmas morning, the victim must have left town because she received a text message from him the next day saying that he was in Las Vegas. Later, she told the police that he might be in Cripple Creek. Finally, she stated that she didn't know where he was, but that she believed he was still alive. Ultimately, however, she admitted that she “[had not] been honest with [police investigators] from the beginning” and that she “shot [the victim].” In other words, she admitted that she had misled investigators about the fact that she had been in contact with the victim and that, instead, she had shot him. As the majority points out, the prosecution in this case repeatedly referred to the fact that Wend had lied to police investigators about the victim's whereabouts. Maj. op. at 1092-93;
id. at 1099. Importantly, however, her counsel repeatedly referred to her “lies” as well. In opening statement, Wend's counsel stated that:
And she does
lie to people about what happened to [the victim]. She
lies because she's afraid of what's going to happen to her if she tells the truth.
(emphases added). Wend's counsel repeatedly used the term “lie” in his closing as well. After discussing Wend's theory of self-defense, Wend's counsel stated:
Which-which brings us to the
lies. That's all [the prosecution has] left. And, yes, Jennifer Wend
lied. Pretty obvious. She
lied to a number of people. She
lied about what happened, but remember, the fact that Jennifer Wend may have
lied about what happened does not change the fact of what actually happened.
(emphases added). Later on in the closing argument, Wend's counsel stated:
Oftentimes, once a
lie is told, it's not gonna come clean until the
lie has brought everything down upon it. And Jennifer Wend told a
lie, and it did take on a life of its own. She told that
lie, and then she felt boxed in. That lie had been told. She didn't think the police were gonna believe her originally, so why are they gonna believe her now that she's told a
lie? So she continued with
it, and continued with
it, and continued with
it until there was no place left to go but the truth.
(emphases added). Wend's counsel then addressed her admission that she had misled police about the whereabouts of the victim, stating:
And that's where they got, to the truth. And you can see it right on the videotape. She says, “I haven't been honest with you. I shot him.” At that point, Wend's counsel returned to her explanation for why she misled police investigators.
She told you in the videotape that she figured even if a person got shot accidentally, they're still gonna go to prison. That, in conjunction with the fact that she was worried, she didn't trust the police, that's why she
lied, ladies and gentlemen. She didn't
lie because she didn't act in self-defense, she
lied because she figured whatever happened, it was gonna be the same result.
(emphases added). Again, Wend's counsel referred to the fact that she had “lied” to various people regarding the victim's whereabouts, but that there 
 were true parts of what she was saying to people:
And everybody knows that oftentimes when a person tells a
lie, you can gleam little nuggets of truth from that
lie.
(emphases added). Finally, Wend's counsel finished his closing argument by reiterating that she misled the police, stating:
She talks about [the victim] pointing a gun at her. You can see the truth, even if it's only in little bits, in the stories that she's told up until she finally does admit what happened. Ladies and gentlemen, she
lied, but that doesn't [ ]change the fact of what happened [when she acted in self-defense].
(emphasis added). The majority's plain error analysis focuses almost exclusively on the prosecution's statements in isolation, suggesting that the statements were so “indiscriminate” as to render Wend's trial unfair. Maj. op. at 1099. In contrast, while the majority acknowledges defense counsel's use of the word “lie,” it finds his statements acceptable, understanding that they were made “only in relation to the interrogation video” and “merely acknowledged the fact that Wend had changed her story.” Maj. op. at 1099, 1092. Yet, as we have consistently held, the prosecutor's use of the word “lie” must similarly be evaluated “in the context of the entire trial.”
Domingo-Gomez, 125 P.3d at 1054;
see also 
Crider v. People, 186 P.3d 39, 43 (Colo.2008) (the prejudicial impact of a prosecutor's statement must be considered “in the totality of the circumstances, on a case-by-case basis”). In this case, Wend admitted that she “[had not] been honest” with police regarding the victim's whereabouts. Additionally, her counsel repeatedly referred to her “lies” during opening and closing argument. Given this context, the prosecution's references to Wend's “lies” did not render her trial fundamentally unfair. Importantly, our concern with respect to the prosecution's use of the word “lie” and its variants in
Domingo-Gomez and
Crider was essentially two-fold: first, the prosecutor's use of the word may convey a personal opinion that could improperly influence the jury and, second, it is such an inflammatory word that it is likely to evoke strong negative emotional reactions against the witness or defendant.
Domingo-Gomez, 125 P.3d at 1050 (“The word ‘lie’ is such a strong expression that it necessarily reflects the personal opinion of the speaker.”);
Crider, 186 P.3d at 41 (the word “lie” “is prohibited not only because it poses a risk of communicating the lawyer's personal opinion about the veracity of a witness and implying that the lawyer is privy to information not before the jury, but also simply because the word “lie” is an inflammatory term, likely (whether or not actually designed) to evoke strong and negative emotional reactions against the witness”). In the context of this case, however, there is little chance that the prosecutor's use of the word “lie” implicated these concerns. As to the first, the prosecution's comments were focused on the fact that Wend misled police regarding the whereabouts of the victim.
See maj. op. at 1092-93;
id. at 1099. Wend in fact admitted that she had misled police, and her counsel repeatedly referred to the fact that she had “lied” about the victim's whereabouts, expressly stating that “yes, Jennifer Wend lied. Pretty obvious.” Where the prosecution characterizes a defendant's admittedly untrue statements as “lies,” there is little risk that the jury will construe the prosecutor's characterization as expressing his personal opinion “based either on some greater experience in judging veracity or ... on some greater knowledge of what actually occurred.”
Crider, 186 P.3d at 43. As to the second, the inflammatory nature of the word “lie” by the prosecutor was undoubtedly muted when Wend's counsel repeatedly used the word as well. Indeed, it is difficult to see how the prosecution's use of the word “lie” could be “flagrantly, glaringly, or tremendously improper,”
Domingo-Gomez, 125 P.3d at 1053 (citation omitted), given that Wend's counsel repeatedly characterized Wend's statements as “lies” as well. Here, it appears that Wend's counsel made a strategic decision to directly address the fact that Wend had “lied” about the victim's 
 whereabouts, and offered an explanation for those “lies.” Under the circumstances, it is likely that the failure of Wend's counsel to object to the prosecution's use of the term “lie” “evidences that he perceived no obvious prejudice” to Wend from the statements.
Domingo-Gomez, 125 P.3d at 1054. The majority does not consider whether the context in this case gives rise to these underlying concerns. Instead, it focuses on comparing the factual circumstances here with those in other cases in which prosecutors used the word “lie.” Maj. op. at 1098-99 (discussing
Domingo-Gomez, 125 P.3d 1043 and
Wilson v. People, 743 P.2d 415 (Colo.1987)). But the majority fails to note an important distinction between those cases and the case at bar. In
Domingo-Gomez and
Wilson, the prosecutor used the word “lie” in summarizing the defendant's and defense witness's testimony on the stand, whereas the use of the word here related to evidence presented regarding Wend's out-of-court statements to police. Given Wend's admission that she “[had not] been honest” with the police and her counsel's repeated references to the fact that she had “lied” during the police investigation, the prosecutor's statements were likely taken by the jury as a comment on the evidence in the case.
Cf. 
Crider, 186 P.3d at 43 (finding prosecutor's use of “lie” and its variants not plain error in part because they were “expressly directed at the irreconcilability of certain of [defendant's] assertions” and photographic evidence from the crime scene). Finally, the fact that Wend repeatedly misled investigators about the victim's whereabouts, and then ultimately admitted that she “[had not] been honest” with them and that she had in fact shot the victim, undoubtedly affected the jury's assessment of her argument that she shot the victim in self-defense. Maj. op. at 1098. But given that Wend admitted that she had misled police about the victim's whereabouts, and given the fact that her counsel at trial repeatedly characterized her statements as “lies,” I cannot conclude that the prosecution's characterization of her statements as “lies” created the sort of fundamental unfairness that warrants invocation of the “drastic remedy of reversal under the plain error standard.”
See 
Domingo-Gomez, 125 P.3d at 1055. Accordingly, I would hold that although the prosecutor's statements were improper, they do not warrant reversal in this case. I therefore respectfully dissent from the majority's opinion. I am authorized to state that JUSTICE COATS joins in this dissent. 1. During trial, the prosecutor introduced video of both the aforementioned interrogations of Wend. The prosecutor played segments of the video for the jury and often paused the tape to directly question his witness Detective Graham, who was the interrogator on both occasions. The prosecutor frequently asked Detective Graham to comment on whether he believed Wend was lying during interrogation. Examples of such questioning include:
 Q: So this was the truth that she was telling you there?
 A: No.
 ....
 Q: When you say, “You've been very honest with me,” is that a true statement?
 A: That's a technique. I mean, she's been lying to me, but I was doing some rapport building.
 ....
 Q: Have you ever had anyone that was trying to be more convincing than she was about what the truth was?
 A: Oh she was right up there. I mean, I've had people that tried to convince me that they didn't do something where they ultimately confess to doing it, but she tried very hard to lead me to believe that she was being truthful with me and not lying to me.
 All of these examples came as the jury watched segments of Wend's interrogation video, in which she was actively misleading Detective Graham about Adamson's whereabouts. Beyond merely the potential misconduct in the form of the questioning, we generally do not approve of this use of the video.
 2. “Crocodile tears” is an expression that generally refers to a hypocritical or insincere display of emotion. The possible origins of the expression vary from the myth that crocodiles possess no tear ducts to tales of crocodiles weeping to lure their prey or crying over their victims as they consume them. 3. The court of appeals in its opinion did rule on three evidentiary issues that would impact a new trial, but passed on the other substantive issues. 4. For example, the court of appeals in
People v. Dashner found no error when the prosecutor stated that the defendant had lied because the prosecutor supported the statement with evidence demonstrating that the defendant had in fact lied. 77 P.3d 787, 792 (Colo.App.2003). Similarly, the court of appeals in
People v. Kerber referenced cases from other jurisdictions in support of its conclusion that use of the word “lie” could be acceptable if it referred to actual lies. 64 P.3d 930, 934-35 (Colo.App.2002) (“We have not, however, established that referring to testimony as a lie constitutes per se prosecutorial misconduct.” (quoting
United States v. Hernandez-Muniz, 170 F.3d 1007, 1012 (10th Cir.1999))). 5. Although Wend argues that her generalized objections to other potential examples of misconduct involving witness questioning should apply to all instances of misconduct, we need not reach this argument because we decide the case solely on the more narrow issue of misconduct in opening and closing statements. 6. We need not address the other instances of potential misconduct because the number and gravity of the examples of misconduct in the opening and closing statements alone support our remand for a new trial. These other instances include asking the witness Randy Anderson if he was suspicious of Wend's motives for borrowing a gun; asking the witness Deborah Van Tassel if she thought Wend was telling the truth; repeatedly asking the witness Detective Derek Graham if Wend was telling the truth and prodding Graham to opine on Wend's truthfulness in general; and appealing to the future needs of the community by saying Wend “would be on the streets ... dealing drugs” unless the jury convicted her.