22CA1788 Peo v Shady 07-18-2024 COLORADO COURT OF APPEALS Court of Appeals No. 22CA1788 City and County of Denver District Court No. 21CR3836 Honorable A. Bruce Jones, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Stephen A. Shady, Defendant-Appellant. JUDGMENT AFFIRMED Division I Opinion by JUDGE SCHOCK J. Jones and Welling, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced July 18, 2024 Philip J. Weiser, Attorney General, Abigail M. Armstrong, Assistant Attorney General Fellow, Denver, Colorado, for Plaintiff-Appellee Cynthia A. Harvey, Alternate Defense Counsel, Aurora, Colorado, for Defendant-Appellant 
1 ¶ 1 Defendant, Stephen A. Shady, appeals his conviction for felony menacing. We affirm the judgment. I. Background ¶ 2 The charge in this case stems from an altercation between Shady and William Ewoldt after Shady’s vehicle blocked Ewoldt’s on a city street. Although the nature and details of the altercation were disputed at trial, the evidence generally showed the following. ¶ 3 Shady was driving a pickup truck ahead of Ewoldt and turned right onto a street that was partially closed for construction. After making the turn, Shady parked his truck in such a way that Ewoldt, who was making the same right turn, did not believe he could get by. Ewoldt honked his horn at Shady several times. ¶ 4 Eventually, Shady got out of his truck and approached Ewoldt, who was still in his vehicle. According to Ewoldt, Shady began yelling at him and asked him to get out of the car so they could “settle this now.” Shady then went back to his truck and got a knife, which he waved around as he continued to yell at Ewoldt. Ewoldt called 911, and Shady put the knife back in the truck. ¶ 5 Shady’s version of events was slightly different. He claimed that he was not blocking Ewoldt’s vehicle and initially approached 
2 Ewoldt only to tell him he could get around Shady’s truck. According to Shady, Ewoldt was yelling and cussing at him and revved his engine, which Shady took as a threat. Shady said that when Ewoldt reached to get his phone, he thought Ewoldt was getting a gun and only got the knife at that point to protect himself. ¶ 6 Shady was charged with one count of felony menacing under section 18-3-206(1), C.R.S. 2021, and the case went to a jury trial. Ewoldt and Shady both testified at trial, as did the two responding officers and a bystander who had seen Shady with the knife. ¶ 7 Shady’s primary defenses were that he did not threaten Ewoldt and that he had acted reasonably in self-defense because he believed Ewoldt had a gun. In support of this self-defense argument, defense counsel stressed Shady’s military training, which put him in a “combative mindset” when faced with a threat, and his background “growing up in the south in Alabama . . . where if you saw somebody reaching towards their glove compartment, that meant that that was probably a gun.” The prosecution argued, among other things, that Shady was the initial aggressor. ¶ 8 The jury found Shady guilty, and the district court sentenced him to two years of probation. 
3 II. Bergerud Hearing ¶ 9 Shady first argues that the district court violated his right to due process and right to effective assistance of counsel by denying what he calls his motion for substitution of counsel. We disagree. A. Additional Background ¶ 10 Near the end of the first day of trial, defense counsel advised the court that Shady “believes that there’s a conflict of interest and would like to raise a Bergerud issue.” See People v. Bergerud, 223 P.3d 686 (Colo. 2010). Counsel explained that he did not believe there was a conflict of interest but that Shady had the right to express those concerns. The court ordered a Bergerud hearing before a different judge to determine whether there was a conflict. ¶ 11 At the Bergerud hearing, defense counsel explained that the genesis of the hearing was Shady’s “concerns about certain questions” that he wanted counsel to ask the testifying officer and that counsel refused to ask because he believed they were irrelevant. Counsel asserted that, despite this disagreement, there was no conflict because the theory of defense — denial and self-
defense — remained “the same and intact” without those questions. 
4 ¶ 12 Shady agreed with defense counsel’s explanation of his concerns. He elaborated: I wouldn’t say there’s too much of a conflict, I guess, or conflict of interest. . . . I just feel like there’s certain things that I would like to ask and he is saying to me that he doesn’t think that he should because they’re not relevant to the case . . . . In that sense . . . there’s a conflict of interest. ¶ 13 Shady confirmed that he had no concerns with his counsel’s representation until the officer testified. He also confirmed that his concern did not “rise[] to the level that would prevent [him] from continuing to proceed with [defense counsel] as his attorney”: I have liked what he’s done with respect to the case now and prior. I was just hoping that maybe he could budge him and ask some of these questions, but I also don’t want to overstep him or jeopardize myself. ¶ 14 At that point, the district court attempted to summarize the consequences of Shady’s request: Well, let’s talk about that, okay? Because when you request to be — raise a conflict with your attorney at this late stage — I mean you’re in the middle of the trial now, right? — and the prosecution has begun. The jury’s been impaneled. And in some circumstance, if the Court were to find that this dispute rises to the level of a conflict and a breakdown — a complete breakdown in your communication 
5 with your attorney, then the options would only be that you would proceed without an attorney . . . if you felt that strongly about it. So help me understand. It doesn’t sound like you feel that strongly that [defense counsel] cannot continue to represent you in this case. . . . You just want . . . to be heard on your concern about the questioning of this particular witness. ¶ 15 Shady agreed. He simply wanted clarity on how it would jeopardize him to ask his desired questions. Those questions concerned (1) the officer’s placement of him in a police car alone rather than with another officer, as the officer had testified; and (2) the officer’s response to seeing Shady’s military identification. Shady believed these questions would show that the officers had lied and mistreated him. Defense counsel explained that the first proposed question was irrelevant, but he agreed to ask the second. ¶ 16 The Bergerud court again confirmed that Shady was satisfied with his counsel’s representation and that his disagreement with counsel was confined to this “one area of questioning.” It explained that “lawyers in this context typically are given great leeway in terms of judgment regarding trial strategy.” The court then “den[ied] the request,” finding that “there is no breakdown in communication,” but just “a simple disagreement regarding trial 
6 strategy.” It further concluded that none of Shady’s constitutional rights were impaired by defense counsel’s chosen strategy. B. Applicable Law and Standard of Review ¶ 17 A defendant is not entitled to substitute court-appointed counsel except upon a showing of “good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict.” Ronquillo v. People, 2017 CO 99, ¶ 19 (citation omitted). Thus, when a defendant objects to court-
appointed counsel, the district court must inquire into the reasons for the dissatisfaction. Bergerud, 223 P.3d at 694. This inquiry is particularly important when the defendant’s request comes “on the eve of trial or under circumstances which are likely to result in a continuance.” People v. Arguello, 772 P.2d 87, 94 (Colo. 1989). ¶ 18 The substitution of court-appointed counsel upon good cause “protects only the right to effective assistance of counsel.” Ronquillo, ¶ 19. That means that substitution is not warranted unless “the defendant has a well-founded reason for believing that the appointed attorney cannot or will not competently represent him.” People v. Johnson, 2016 COA 15, ¶ 30. Disagreements about 
7 trial strategy do not establish good cause for substitution of counsel. People v. Kelling, 151 P.3d 650, 653 (Colo. App. 2006). ¶ 19 Determining whether substitution of counsel is warranted “requires an inquiry laden with factual determinations.” Bergerud, 223 P.3d at 694. At the threshold of this inquiry, the court must consider “the type of limitation on counsel that is implicated by the defendant’s request in order to locate the dispute within the landscape of Sixth Amendment precedent and properly assess any constitutional concerns.” Id. at 695. In assessing the constitutional implications of the defendant’s request, a court may consider four factors: (1) the timeliness of the motion; (2) the adequacy of the court’s inquiry into the defendant’s complaint; (3) whether the attorney-client conflict is so great that it resulted in a total lack of communication or otherwise prevented an adequate defense; and (4) the extent to which the defendant substantially and unreasonably contributed to the underlying conflict. Id. ¶ 20 We review the denial of a defendant’s request for substitute court-appointed counsel for an abuse of discretion. Johnson, ¶ 29. 
8 C. Analysis ¶ 21 Shady frames his argument as one that the district court erred by denying his motion for substitution of counsel. But Shady did not request substitute counsel. To the contrary, he told the court that his concerns did not require new counsel. He simply wanted the court to intervene and persuade his attorney to ask cross-
examination questions the attorney did not want to ask. Thus, even broadly construing Shady’s statements at the Bergerud hearing, it is not clear that there was any request for the Bergerud court to deny. See Bergerud, 223 P.3d at 694, 696-97; People v. Session, 2020 COA 158, ¶ 18 (noting that a Bergerud hearing is generally required “upon receiving a motion to substitute counsel”). ¶ 22 In any event, there was no good cause for substitution. The so-called “conflict” — which Shady said was “[not] too much of a conflict” — was that he wanted his attorney to ask certain questions that his attorney believed were irrelevant. There was no breakdown of communication, complete or otherwise. See Ronquillo, ¶ 19. Shady was generally satisfied with the representation. And the disagreement concerned only an ancillary issue of trial strategy. It did not implicate any of Shady’s substantive constitutional rights. 
9 Cf. Bergerud, 223 P.3d at 702-03, 706 (holding that defense counsel’s intent to “completely contradict [defendant’s] testimony” or to “persist in wholly undermining the believability of his testimony” would usurp defendant’s constitutional right to testify). Indeed, Shady does not argue on appeal that there was good cause. ¶ 23 Instead, he focuses entirely on an erroneous statement of law by the Bergerud court. After Shady described the nature of his disagreement with counsel, the court told him that “in some circumstance, if the Court were to find that this dispute rises to the level of a conflict and . . . a complete breakdown in your communication with your attorney, then the options would only be that you would proceed without an attorney.” This was incorrect. When a defendant establishes a conflict of interest or a complete breakdown in communications that undermines the right to effective representation, the defendant is entitled to substitute counsel, even if it means postponing trial. Arguello, 772 P.2d at 94. ¶ 24 But the court’s misstatement of the law was harmless because there unquestionably was no conflict or complete breakdown of communication rising to the level of good cause — as Shady himself acknowledged. Moreover, the request (to the extent it was one) 
10 came near the end of the first day of trial, after jury selection, opening statements, and the testimony of two witnesses. See Bergerud, 223 P.3d at 698 (“Any request for new counsel that is made once the trial has begun puts a trial court in a difficult position.”). Under these circumstances, although the court framed the issue incorrectly, it was fundamentally correct that Shady’s only options at that point were to continue with existing counsel or proceed pro se. See Arguello, 772 P.2d at 94. Without good cause, Shady was not entitled to substitute counsel. Ronquillo, ¶ 19. ¶ 25 We reject Shady’s contention that the Bergerud court’s misstatement infected the entire hearing. By the time the court made that statement, it had already inquired into the basis of Shady’s complaint, and Shady had confirmed that (1) there was no substantial conflict; (2) his complaint was limited to his attorney’s refusal to ask particular questions; (3) he had no prior concerns with his attorney; and (4) he was satisfied with his attorney’s representation. That was enough to establish the absence of good cause for substitution, regardless of what came next. See Bergerud, 223 P.3d at 695-96 (noting that the purpose of the inquiry is to determine the “facts underlying the defendant’s dispute” and 
11 provide an adequate record for “reviewing the constitutional implications” of defendant’s request). Shady’s subsequent statements merely elaborated on what he had already said. ¶ 26 Shady also asserts that the Bergerud court’s misstatement of the law was structural error requiring reversal. But structural error exists when a defendant elects to proceed pro se after a request for substitution of counsel is denied, such that there is a “complete denial of [the defendant’s] right to counsel.” Id. at 696. When the defendant proceeds with court-appointed counsel, any error in denying a request for new counsel is reviewed for harmless error. Id. The court in this case did not even err by denying the request. It simply misdescribed a legal standard that it correctly applied. There was thus no constitutional violation at all. III. Prosecutorial Misconduct ¶ 27 Shady also argues that the prosecutor committed misconduct during rebuttal closing argument by shifting the burden of proof. In support of this argument, Shady simply quotes a two-page excerpt of the trial transcript, without identifying any specific statements he contends were improper. We see no misconduct. 
12 A. Additional Background ¶ 28 Defense counsel argued in closing that, based on Shady’s military training and experience “growing up in the south in Alabama,” it was reasonable for him to believe that Ewoldt was pulling a gun on him and “to do anything that he could to defend himself.” He argued that Shady acted reasonably by grabbing a knife because it was “inherently a lesser degree of force” than a gun. ¶ 29 In rebuttal closing, the prosecutor argued that even given Shady’s military training and assuming he believed Ewoldt had a gun, it was not reasonable for Shady to return with a knife: Mr. Shady believes that Mr. Ewoldt might have a gun. Even if we believe Mr. Shady, for him to go to his truck that is like he said and is very clear, very much larger than Mr. Ewoldt’s Subaru, for him to go to this truck and only grab a knife, sure, that’s a lesser . . . degree of force . . . but is it actually reasonable for someone to grab a knife when there’s someone else . . . pointing a gun at you? Is that actually reasonable or is it more reasonable for him to hide or sit in the car or maybe because he — in his Army training — ¶ 30 At that point, defense counsel objected to “burden shifting.” The court overruled the objection and the prosecutor continued: Or because he was trained to actually fight and never run away, wouldn’t the reasonable 
13 thing to do — to get in his large truck that is clearly larger and safer than Mr. Ewoldt’s Subaru. It doesn’t mean he’s running away. He’s actually protecting himself with protection being a larger truck. Wouldn’t that be more reasonable? Now even if you believe that based on his Army training — combat training — . . . that grabbing of a knife was reasonable, it frankly doesn’t really matter because Mr. Shady was the initial aggressor. He was not only the initial aggressor, but he was the only aggressor in this case. Members of the jury, think about what Mr. Shady said to the 911 operator and what Mr. Shady couldn’t say or admit in court today. Think about how he never told the 911 operator that Mr. Ewoldt revved his engine. There was no threat to Mr. Shady and when Mr. Shady grabbed his ten inch blade knife and walked up to Mr. Ewoldt’s Subaru, he committed the crime of menacing with a deadly weapon . . . . B. Applicable Law and Standard of Review ¶ 31 We apply a two-step analysis to claims of prosecutorial misconduct. Wend v. People, 235 P.3d 1089, 1096 (Colo. 2010). We first determine “whether the prosecutor’s questionable conduct was improper based on the totality of the circumstances.” Id. If it was, we then consider whether that conduct warrants reversal. Id. 
14 We review preserved claims of prosecutorial misconduct for harmless error
1 and unpreserved claims for plain error. Id. at 1097. ¶ 32 To determine whether a prosecutor has impermissibly shifted the burden of proof, we must “evaluate the strength of the prosecution’s burden-shifting evidence or comment in light of the entire record to assess whether the burden was actually shifted.” People v. Santana, 255 P.3d 1126, 1131 (Colo. 2011). When a prosecutor makes comments implying that the defendant carries the burden, that assessment turns on the degree to which (1) the prosecutor specifically argued that the defendant carried the burden of proof; (2) the prosecutor’s actions constituted a fair response to defense counsel’s comments; and (3) the jury was informed by counsel and the court about the defendant’s presumption of innocence and the prosecution’s burden of proof. Id. at 1131-32. A prosecutor does not impermissibly shift the burden of proof by “comment[ing] on the lack of evidence confirming defendant’s theory of the case.” Id. at 1132 (citation omitted). 1 The parties disagree as to whether the constitutional or nonconstitutional harmless error standard would apply. Because we conclude that there was no misconduct, we need not decide this issue. 
15 C. Analysis ¶ 33 Although Shady reiterates his trial counsel’s objection that the prosecutor’s rebuttal closing argument amounted to burden shifting, he does not identify what specific comments he contends shifted the burden or why. It is the appellant’s responsibility to set forth “a clear and concise discussion of the grounds upon which the party relies in seeking a reversal . . . of the judgment.” C.A.R. 28(a)(7)(B); see also People v. Sanders, 2023 CO 62, ¶ 16. When an appellant fails to offer supporting argument, we will not assume the mantle of doing so. Sanders, ¶ 16; see also People v. Duran, 2015 COA 141, ¶ 20 (noting that party may not shift to the court “the task of locating and synthesizing the relevant facts and arguments”). By failing to address how the prosecutor’s comments shifted the burden of proof, Shady does not develop this argument. See People v. Cuellar, 2023 COA 20, ¶ 44 (declining to address prosecutorial misconduct claim where defendant did not discuss how the challenged statements violated his right to counsel). ¶ 34 In any event, we see nothing in the prosecutor’s comments that impermissibly shifted the burden. The only preserved objection was to the prosecutor’s statement that it would have been 
16 more reasonable for Shady to sit in his truck than to grab a knife and return. The prosecutor did not say, or even imply, that Shady bore the burden of proving his actions were reasonable. She simply argued, based on inferences from the facts in evidence, that Shady’s actions were not reasonable. See Santana, 255 P.3d at 1132 (noting that the prosecution may properly make an argument about the evidence and inferences that can be drawn from the evidence). Those comments were not only consistent with the prosecution’s burden of proof but were a fair response to defense counsel’s argument that Shady’s actions were reasonable. See id. at 1131. ¶ 35 Moreover, the jury was repeatedly “informed by counsel and the court about the defendant’s presumption of innocence and the prosecution’s burden of proof.” Id. at 1131-32. The district court instructed the jury that (1) Shady was presumed innocent; (2) the prosecution had the burden of proof beyond a reasonable doubt; and (3) the prosecution had the burden of disproving, beyond a reasonable doubt, Shady’s “defense of person” affirmative defense. ¶ 36 The prosecutor similarly reminded the jury of the People’s burden of proof — both the burden of “proving each and every element of the charge beyond a reasonable doubt” and “the burden 
17 of disproving at least one” of the elements of Shady’s affirmative defense — in the initial closing. And the prosecutor began the rebuttal closing by emphasizing that the People “embrace[d] the burden of proving this case beyond a reasonable doubt.” ¶ 37 Thus, in light of the entire record, we conclude that the prosecutor in no way implied that Shady had the burden of proof, much less improperly shifted the burden of proof. See id. at 1131.
2 IV. Disposition ¶ 38 The judgment is affirmed. JUDGE J. JONES and JUDGE WELLING concur. 2 To the extent Shady asserts that the prosecutor expressed an improper opinion as to the veracity of Ewoldt and Shady, that argument too is undeveloped (and unpreserved), and regardless, we perceive no misconduct. See People v. Liebler, 2022 COA 21, ¶ 58 (“[A] prosecutor may point to circumstances that raise questions or cast doubt on a witness’[s] testimony and draw reasonable inferences from the evidence as to the credibility of witnesses.”).