22CA1209 Peo v Matthews 05-22-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1209
La Plata County District Court No. 21CR1
Honorable Suzanne F. Carlson, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Damon Lamont Matthews,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE SULLIVAN
J. Jones and Lipinsky, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 22, 2025

Philip J. Weiser, Attorney General, Carmen Moraleda, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Mallika L. Magner, Alternate Defense Counsel, Crested Butte, Colorado, for
Defendant-Appellant

¶ 1    Defendant, Damon Lamont Matthews, appeals the judgment of conviction entered on a jury verdict finding him guilty of multiple offenses, including first degree murder, arising from the shooting of his spouse (the victim).  We affirm the judgment.

## I.    Background

¶ 2    Matthews had a history of domestic violence involving the victim.  Shortly after being released from jail for a domestic violence offense, and despite a protection order that barred contact, Matthews moved back into his home that he shared with the victim.  He settled into the "back house" — a detached garage converted into a living area.

¶ 3    About a month later, while in the back house, Matthews began arguing with the victim regarding her ex-husband.  Their argument grew into an altercation during which the victim attacked Matthews, bit and scratched him, and ripped his shirt.  Worried that their altercation might alert the neighbors to his unlawful presence, Matthews strangled the victim for approximately three minutes.  While the victim lay on the floor gasping, Matthews entered the main house, picked up the victim's gun from her

upstairs bedroom, returned to the back house, and shot the victim once in the head, killing her.

¶ 4     After shooting the victim, Matthews returned the gun to the victim's bedroom and drove away in her car.  Law enforcement eventually arrested Matthews and interviewed him regarding the victim's death.  During the interview, Matthews confessed to shooting the victim.

¶ 5     Before trial, the prosecution gave notice under CRE 404(b)(3) that it intended to introduce certain other acts evidence, including a letter Matthews wrote while in jail in which he threatened another inmate for cooperating with the prosecution.  The district court ruled that the letter was admissible to show Matthews' state of mind, among other reasons, and said that it would provide a contemporaneous limiting instruction at trial.

¶ 6     During jury selection, the prosecution exercised a peremptory challenge to excuse a prospective juror who self-identified as Native American and Hispanic.  Defense counsel objected under *Batson v. Kentucky*, 476 U.S. 79 (1986).  After a bench conference, the court overruled the defense's *Batson* challenge and excused the prospective juror.

¶ 7     The jury found Matthews guilty of first degree murder, first degree assault, violation of bail bond conditions, and two counts of violating a protection order.  But it acquitted him of aggravated intimidation of a witness or victim and retaliation against a witness or victim.

¶ 8     Matthews appeals.  He contends that the district court erred by (1) denying his *Batson* challenge; (2) admitting the letter he wrote while in jail; and (3) failing to correct prosecutorial misconduct during closing argument.  We address each contention in turn.

## II.     *Batson* Challenge

¶ 9     Turning first to Matthews' *Batson* challenge, he asserts that (1) the prosecution failed to provide a race-neutral reason under *Batson*'s second step when it exercised a peremptory challenge to excuse Prospective Juror J; and (2) even if the prosecution's stated reason satisfied the second step, he nonetheless proved purposeful discrimination under *Batson*'s third step.  We disagree with both contentions.

### A.     Applicable Law and Standard of Review

¶ 10    The Equal Protection Clause of the Fourteenth Amendment prohibits a party from using a peremptory challenge to strike a

3

prospective juror based on race. *Batson*, 476 U.S. at 86-87; *see also* Colo. Const. art. II, § 25; *People v. Johnson*, 2024 CO 35, ¶ 14 (peremptory challenges often "cloak purposeful discrimination"). We follow the Supreme Court's three-step *Batson* framework when evaluating whether a party improperly struck a prospective juror based on race.[1] *Johnson*, ¶ 17.

¶ 11     Under *Batson*'s first step, the objecting party must make a prima facie showing that the striking party exercised a peremptory challenge based on race. *People v. Austin*, 2024 CO 36, ¶ 8. If the objecting party meets this burden, the burden shifts to the striking party at *Batson*'s second step to provide a race-neutral reason for the strike. *People v. Romero*, 2024 CO 62, ¶ 34.

¶ 12     If the striking party proffers a race-neutral reason, the trial court moves to *Batson*'s third step. *Id.* at ¶ 36. At this final step,

---

[1] *Batson* isn't limited to racial discrimination or criminal cases. *See, e.g., J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128-29 (1994). We nonetheless focus our analysis on that context because this is a criminal case and Matthews limits his challenge to discrimination based on race and ethnicity. Consistent with United States Supreme Court and Colorado Supreme Court precedent, we use the term "race" broadly throughout this opinion to refer to biases based on both race and ethnicity. *See People v. Ojeda*, 2022 CO 7, ¶ 1 n.1 (citing *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 214-15 (2017)).

the objecting party may present evidence or argument to rebut the striking party's stated reason for the strike. *Id.* The court then weighs all the relevant circumstances bearing on the issue of purposeful discrimination. *Id.* at ¶ 37. These may include, but aren't limited to, the striking party's demeanor, the reasonableness and plausibility of the proffered race-neutral explanations, and whether the rationales given are rooted in accepted trial strategy. *Id.* The court must decide whether the objecting party has established purposeful racial discrimination by determining whether the striking party's peremptory challenge was motivated in substantial part by discriminatory intent. *People v. Madrid*, 2023 CO 12, ¶ 35. The "best approach" is for the court to make explicit demeanor and credibility findings. *Romero*, ¶ 72. The burden of persuasion regarding discriminatory motivation rests with, and never shifts from, the objecting party. *People v. Beauvais*, 2017 CO 34, ¶ 24.

¶ 13    We review de novo whether the striking party has articulated a race-neutral reason at *Batson*'s second step. *Johnson*, ¶ 21. But we review for clear error the trial court's ultimate step-three conclusion regarding purposeful discrimination. *Romero*, ¶¶ 45-47.

5

## B.    Additional Background

¶ 14    Prospective Juror J indicated on her questionnaire that her decision-making was "biased because of minority and gender bias." In chambers, the district court asked Prospective Juror J to elaborate on her questionnaire:

> PROSPECTIVE JUROR [J]: I just think my own background, and I have taken some criminal justice classes as well as of course law.  My mom, she's not in practice, she was an attorney, so I kind of got to see a little bit of this type of cases and hear about them from her, like what she's been through, like other news and all that.  And I think that might impart — kind of decide how I impart, I guess judge things, like, I guess is the way I could explain.  I'm more lenient to minority and gender based, like especially female.  Like, for myself it would be more like Native American because I'm native as well as like Hispanic just because of like — I don't know how to explain it.
>
> . . . .
>
> THE COURT: Do you feel like you come in here sort of biased in favor of the defendant in this case?
>
> PROSPECTIVE JUROR [J]: It's like giving the defendant doubt sort of, but yeah.

¶ 15    The court then turned to the prosecution's burden of proof by asking whether Prospective Juror J would be willing to convict

6

Matthews if the prosecution proved the offense elements beyond a reasonable doubt. Prospective Juror J responded, "I would if there was solid evidence that can't be refuted." When the court asked whether that meant that she would require "more evidence than beyond a reasonable doubt," Prospective Juror J explained that she would likely need physical evidence, and not just witness statements, to vote to convict:

> PROSPECTIVE JUROR [J]: . . . I don't know a lot — I don't know anything about this case but I would — if there were any evidence and they would show it and completely like explain it and I would understand it, then I would be like all right.
>
> But if there is no evidence then and there's just statements, but nothing to really, like, connect, like, I guess you could say like physical evidence or like DNA or anything like that, then I don't know if I could like confidently participate as a juror if there's not something like a solid decision based on evidence.

¶ 16    Upon further questioning, Prospective Juror J appeared to vacillate on whether she could convict if the prosecution proved its case beyond a reasonable doubt and whether race would factor into her decision:

7

[PROSECUTION]: . . . Should we be worried that you might say "Well, the prosecution proved the case beyond a reasonable doubt, but I still think, you know, based on speculation or some vague concept that I want to vote not guilty"? Is that a concern that we should have about you?

PROSPECTIVE JUROR [J]: I don't think so. I consider myself very logical and rational, almost like if there is an explanation and it's rational, then I can judge on that.

[PROSECUTION]: Okay. And then the second question I guess is if we do prove the case beyond a reasonable doubt, you should vote guilty. Do you have some hesitation that you might not do that based on the race or ethnicity of the defendant?

PROSPECTIVE JUROR [J]: I would have some hesitation, but if there's evidence that will show otherwise, then I won't.

. . . .

[DEFENSE]: What it would come down to is if the evidence convinces you beyond a reasonable doubt that Mr. Matthews is guilty, you'd have to vote guilty if that's where you find yourself. Are you comfortable doing that?

PROSPECTIVE JUROR [J]: Uh-huh.

[DEFENSE]: You wouldn't find him not guilty just because he was black I guess?

PROSPECTIVE JUROR [J]: No.

¶ 17    Later, defense counsel asked the prospective jurors if they believed that the cards were "stacked against Mr. Matthews" based on the "initial outline" of the case as read by the court. Prospective Juror J responded, in part, that she "kind of lean[ed] towards my bias, which is race and gender," and that "my perspective is that a lot of time with law in cases like these, minorities get the short end of the stick." She also explained that her "two bias backgrounds" would render her "a little bit more, like, not rooting for but kind of like 'I wish that it wasn't true.'" Prospective Juror J later clarified, however, that she "d[id]n't think [it] w[ould] be an issue" for her to follow the court's protocols.

¶ 18    At the end of jury selection, the prosecutor exercised a peremptory challenge to excuse Prospective Juror J. Defense counsel objected under *Batson*, arguing that the prosecutor had unlawfully discriminated against Prospective Juror J based on her race. The prosecutor disagreed, explaining that he exercised a peremptory challenge on Prospective Juror J because she (1) "makes decisions based on minority and gender bias"; (2) "will bring . . . racial discrimination" into the case; and (3) would "resolve doubt in favor of [Matthews] because of his race."

9

¶ 19    Without making explicit step-three findings on demeanor or credibility, the court agreed with the prosecution.  It ruled that Prospective Juror J "said she would make decisions based upon racial bias, which is exactly what we can't have, is people making decisions based upon racial bias."  The court therefore denied Matthews' *Batson* challenge.

¶ 20    On appeal, we initially issued an order of limited remand for additional factual findings under *Batson*'s third step.  *See Austin,* ¶ 24 (remanding for further findings because the record contained "only very minimal findings" under *Batson*'s second and third steps).  After entering additional detailed factual findings, the district court reconfirmed that Matthews hadn't shown purposeful discrimination under *Batson.*

### C.    Analysis

¶ 21    The parties agree that whether Matthews established a prima facie case at step one is moot because the district court heard the prosecutor's race-neutral explanation and ruled on the ultimate question of purposeful discrimination.  *See People v. Wilson,* 2015 CO 54M, ¶ 12.  So we proceed directly to step two before turning to *Batson*'s final step.

10

### 1. Step Two

¶ 22　Matthews contends that the prosecutor's step-two explanation for striking Prospective Juror J was race-based because the juror "voiced her personal experiences" as a Native American and Hispanic woman and was "herself racially discriminatory."

¶ 23　Our supreme court, however, recently rejected the reasoning underlying Matthews' argument. *See Johnson*, ¶¶ 42-44. In *Johnson*, announced after Matthews filed his opening brief in this appeal, the supreme court cautioned that courts "must resist the urge to shift the focus of the step-two inquiry away from the striking party's stated reasons for the strike and onto the source of the juror's potential bias." *Id.* at ¶ 42. The court explained that, although a prospective juror's biases "may be closely linked to (or because of)" her race, that doesn't convert the striking party's reason for excusing her into a race-based reason. *Id.*; *accord Austin*, ¶¶ 18-19.

¶ 24　In this case, the prosecutor didn't strike Prospective Juror J "based on an assumption that, as a person of color," she "would inherently be biased against law enforcement." *Austin*, ¶ 19. Instead, the prosecutor's stated reasons were based on Prospective

11

Juror J's description of her personal experiences and how they might affect her "willingness to receive evidence impartially." *Johnson*, ¶ 44. Prospective Juror J explained that her personal experiences, and the sources of her bias, included her classes in criminal justice and observing "this type" of case through her mother's law practice. And while Prospective Juror J suggested that some of her experiences and biases may be "linked to (or because of)" her race, those statements didn't transform the prosecutor's proffered reasons into race-based reasons that *Batson* forbids. *Id.* at ¶ 42.

¶ 25   Accordingly, the prosecutor satisfied *Batson*'s "low" step-two burden by providing a race-neutral reason for striking Prospective Juror J. *Id.* at ¶ 46.

### 2.   Step Three

¶ 26   In response to our limited remand order, the district court made detailed findings regarding the plausibility of the prosecutor's nondiscriminatory reasons for striking Prospective Juror J. They included findings on the prosecutor's demeanor, Prospective Juror J's demeanor, the reasonableness of the prosecutor's proffered race-neutral explanation, and whether the prosecutor's rationale was

12

rooted in accepted trial strategy. *See Johnson,* ¶¶ 20, 47; *Austin,* ¶ 24.

¶ 27    Specifically, the court made the following findings regarding demeanor:

- The prosecutor responded "immediately and strongly" to Matthews' *Batson* challenge by reciting Prospective Juror J's statements showing that she would apply race-based bias; the prosecutor didn't "need any time to explain his thinking."

- Prospective Juror J's body language and statements were initially confident, but she became "unsure" and hesitant when pressed whether she could convict Matthews if the prosecution proved the offense elements beyond a reasonable doubt; she didn't want to commit to following the applicable burden of proof.

- When asked whether she could be fair and impartial, most of Prospective Juror J's responses were ambiguous, required qualification, and "came across as partial agreement."

- Prospective Juror J was firm that she would make decisions based on racial bias and exhibited "general ambivalence" when agreeing to follow the law.

¶ 28    Regarding the reasonableness of the prosecutor's race-neutral explanations and whether the prosecutor's rationale was rooted in accepted trial strategy, the court found the following:

- The prosecutor didn't strike Prospective Juror J based on race, but rather because she said she would make decisions based on racial and gender bias.

- The prosecutor's explanation was credible and reasonable given Prospective Juror J's responses to questions, including that she would hesitate to convict even if the prosecution had proved the offense elements beyond a reasonable doubt.

- Using a peremptory challenge to strike a prospective juror who will make decisions in a defendant's favor based on racial or gender bias is an acceptable trial strategy.

¶ 29    Based on these findings, the court found that Matthews hadn't carried his burden of establishing purposeful racial discrimination.

The court's thorough findings show that it considered all the relevant circumstances and the persuasiveness of the prosecutor's race-neutral reasons for striking Prospective Juror J. *See Romero*, ¶ 71; *see also id.* at ¶ 44 (appellate courts afford the trial court's demeanor and credibility findings "great deference" because the trial court can "best discern 'the presence or absence of discriminatory intent' at step three") (citation omitted). Because the court's findings enjoy record support, we conclude that the court didn't clearly err by denying Matthews' *Batson* challenge at the final step. *See id.* at ¶ 71.

¶ 30     Accordingly, Matthews didn't meet his burden of proving purposeful racial discrimination under *Batson.*

## III.   CRE 404(b)

¶ 31     Matthews next contends that the district court abused its discretion under CRE 404(b) by admitting a letter that he wrote to another inmate while in jail. We perceive no abuse of discretion.

### A.   Additional Background

¶ 32     While in jail and awaiting trial, Matthews penned a letter to a fellow inmate (nicknamed Ruthless) regarding a third inmate (Patrick) who Matthews believed was working with the prosecution

against him.  Matthews had allegedly told Patrick earlier that he would kill the victim after she served him with divorce papers. Matthews' letter to Ruthless stated in part as follows:

> Ruthless,
> That fool [Patrick] is in my discovery.  He went out of his way to write the D.A. a letter pertaining to the murder of my wife.  He don't get the penalty of the error of his ways. . . . Patrick is a Rat . . . [a] cheese eater.  I'm trying my hardest to get back over there.  Another life means nothing to me.

¶ 33    The prosecution filed a notice of intent to introduce the letter under CRE 404(b)(3).  Over the defense's objection, the court entered a written order allowing the prosecution to introduce the letter.  The court reasoned that the letter was relevant to whether Matthews murdered the victim; probative of Matthews' motive, intent, deliberation, and consciousness of guilt; and logically relevant independent of any intermediate inference that Matthews acted in conformity with his bad character.  The court also found that the letter's probative value was "very high" and not outweighed by the danger of unfair prejudice.

¶ 34    At trial, defense counsel renewed his objection by asking the court to "reconsider the 404(b) [issue] and exclude testimony about

16

this letter." Defense counsel argued that the letter's probative value was now "diminished" because the prosecution had decided not to call Patrick to testify. The court adhered to its prior ruling and found the letter admissible. However, the court instructed the jury that it could consider the letter only for the limited purposes of deciding whether Matthews (1) acted after deliberation; (2) acted with intent or knowledge; and (3) exhibited consciousness of guilt.

## B. Standard of Review and Applicable Law

¶ 35    We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Vanderpauye*, 2023 CO 42, ¶ 23. A court abuses its discretion when it misapplies the law or when its ruling is manifestly arbitrary, unreasonable, or unfair. *Id.*

¶ 36    Because Matthews preserved this argument, any error in admitting the letter is subject to nonconstitutional harmless error review. *Pernell v. People*, 2018 CO 13, ¶ 22. Under this standard, we will reverse only if the erroneous evidentiary ruling affected the defendant's substantial rights. *Id.*

¶ 37    CRE 404(b) governs the admissibility of other acts evidence. The rule prohibits the use of "[e]vidence of any other crime, wrong, or act . . . to prove a person's character in order to show that on a

17

particular occasion the person acted in conformity with the character." CRE 404(b)(1). But such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." CRE 404(b)(2). And as with all evidence, other acts evidence is admissible only if it's relevant and its probative value isn't substantially outweighed by the danger of unfair prejudice. CRE 401-403.

¶ 38    Our supreme court's four-part *Spoto* framework implements these rules: evidence of extrinsic acts that are suggestive of bad character is admissible only if the evidence (1) is logically relevant (2) to a material fact (3) independent of the prohibited inference that the defendant has bad character, and (4) has probative value that isn't substantially outweighed by the danger of unfair prejudice. *Rojas v. People*, 2022 CO 8, ¶ 27 (citing *People v. Spoto*, 795 P.2d 1314, 1318-19 (Colo. 1990)).

## C.    Analysis

¶ 39    We discern no abuse of discretion in the district court's decision admitting the letter under CRE 404(b).

¶ 40   As to *Spoto*'s first and second factors, the court could reasonably find that the letter was logically relevant to a material fact — whether Matthews murdered the victim after deliberation and with the intent to cause her death. *See* § 18-3-102(1)(a), C.R.S. 2024. Matthews' theory of the case was that he impulsively and hastily killed the victim, rendering him guilty of only second degree murder, not first. As a result, Matthews' state of mind was highly relevant. The letter was logically relevant to this issue because a juror could reasonably infer from Matthews' statement, "Another life means nothing to me," that he harbored malice toward the victim and therefore acted after deliberation and with the intent to kill her.

¶ 41   In addition, the letter was logically relevant to show Matthews' consciousness of guilt because it established that he wanted to eliminate Patrick as a prosecution witness. *See People v. Medina*, 51 P.3d 1006, 1013 (Colo. App. 2001) (evidence was admissible under CRE 404(b) to establish consciousness of guilt because it showed the defendant's "attempt to conceal his role in the victim's death"), *aff'd sub nom. Mata-Medina v. People*, 71 P.3d 973 (Colo. 2003).

¶ 42     Turning to *Spoto*'s third factor, the letter possessed relevance independent of the impermissible inference that Matthews acted in conformity with his bad character. In the letter, Matthews drew a direct line between his intended harm to Patrick and his murder of an unidentified victim. The jury could reasonably infer that the unidentified victim was his spouse; indeed, Matthews confessed to killing his spouse and the letter mentioned the "murder of my wife." And regardless of whether the jury believed that Matthews possessed bad character based on his stated desire to harm Patrick, the jury could reasonably infer that Matthews' direct comparison between Patrick and the victim showed that he killed her after deliberation and with intent. It could similarly conclude from the letter that Matthews' desire to eliminate Patrick as a witness exhibited consciousness of guilt, regardless of his bad character or propensity for harming others. *See Medina*, 51 P.3d at 1013.

¶ 43     While the letter undoubtedly injected some bad character evidence into the trial, *Spoto*'s third step doesn't demand the complete absence of a bad character inference; it merely requires that the proffered evidence be logically relevant independent of that inference. *People v. Lancaster*, 2022 COA 82, ¶ 47.

¶ 44    Finally, the letter's probative value wasn't substantially outweighed by the danger of unfair prejudice.  The court ruled pretrial that the letter's probative value to show Matthews' state of mind was "very high."  Although the court later said that the letter's probative value was "reduced" because Patrick was no longer going to testify, it nonetheless found that the danger of unfair prejudice didn't outweigh the letter's probative value.  Affording the letter its maximum probative value attributable by a reasonable fact finder and the minimum unfair prejudice to be reasonably expected, *Bondsteel v. People*, 2019 CO 26, ¶ 50, we perceive no abuse of discretion in the court's ruling.

¶ 45    Moreover, the court mitigated any danger of unfair prejudice by giving a limiting instruction informing the jury that it couldn't consider the letter as "evidence of Mr. Ma[t]thews' character, whether he is a 'violent person,' a 'bad person,' or whether he is 'the type of person' who commits the crimes alleged in this case."  Absent evidence to the contrary, we presume that the jury heeded the court's limiting instruction.  *People v. Rowe*, 2012 COA 90, ¶ 46.

¶ 46    Accordingly, we conclude that the district court didn't abuse its discretion by admitting the letter under CRE 404(b).

## IV.    Prosecutorial Misconduct

¶ 47    Matthews next contends that the prosecutor committed reversible misconduct during closing argument. We disagree.

### A.    Standard of Review and Applicable Law

¶ 48    Whether a prosecutor's statement constitutes misconduct is left to the trial court's discretion. *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005). We won't disturb the court's rulings regarding such statements absent a showing of an abuse of that discretion. *People v. Strock*, 252 P.3d 1148, 1152 (Colo. App. 2010).

¶ 49    With one exception noted below, Matthews preserved his prosecutorial misconduct arguments by lodging contemporaneous objections during closing argument. We review these preserved contentions for nonconstitutional harmless error. *People v. Ortega*, 2015 COA 38, ¶ 51. But we review Matthews' unpreserved contention for plain error. *Hagos v. People*, 2012 CO 63, ¶ 14. Reversal under this standard requires that the prosecutorial misconduct be obvious and so undermine the fundamental fairness

of the trial as to cast serious doubt on the reliability of the judgment of conviction. *People v. Walker*, 2022 COA 15, ¶ 28.

¶ 50 We conduct a two-step analysis when reviewing a claim of prosecutorial misconduct. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we determine whether the prosecutor's challenged conduct was improper under the totality of the circumstances. *Id.* Second, if the prosecutor's remarks were improper, we evaluate whether they warrant reversal according to the proper standard of reversal. *See id.*

¶ 51 We evaluate claims of improper argument in the context of the argument as a whole and in light of the evidence before the jury. *Strock*, 252 P.3d at 1153. A prosecutor enjoys "wide latitude in the language and presentation style used to obtain justice." *Domingo-Gomez*, 125 P.3d at 1048. Because closing arguments delivered in the heat of trial aren't always perfectly scripted, we accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful. *People v. Samson*, 2012 COA 167, ¶ 30. Even so, prosecutors must exercise caution during closing argument not to misstate the evidence or insert claims calculated to inflame the passions and prejudices of the jury. *People v. Allgier*,

2018 COA 122, ¶ 53. Nor may counsel misstate or misinterpret the law in closing argument. *People v. Weinreich*, 98 P.3d 920, 924 (Colo. App. 2004), *aff'd,* 119 P.3d 1073 (Colo. 2005).

## B. Preserved Contentions

¶ 52    Matthews contends that the prosecutor's repeated use of the words "execute," "execution," and similar permutations of "execute" improperly inflamed the passions of the jurors. But counsel may comment on the evidence admitted at trial and urge the jury to draw reasonable inferences from that evidence. *People v. Shepherd*, 43 P.3d 693, 697 (Colo. App. 2001). Matthews confessed to shooting the victim in the head while she lay on the floor after he strangled her for three minutes. Such a close-range shooting in the head can fairly be described as an "execution style" murder. *See, e.g., Evans v. State*, 995 So. 2d 933, 947 (Fla. 2008); *see also People v. Walters*, 148 P.3d 331, 337 (Colo. App. 2006) (rejecting prosecutorial misconduct argument because counsel's remarks were a "fair comment on the evidence and not improper"). Thus, while the prosecutor's remarks may have been "hard blows," we can't say on this record that they were foul ones. *Allgier*, ¶ 53 (citation omitted).

¶ 53    Matthews also contends that the prosecutor misstated the law regarding his heat of passion defense.  *See* § 18-3-103(3)(b), C.R.S. 2024.  The prosecutor argued that heat of passion didn't apply to Matthews' conduct because the defense applies only if the act causing the death was performed upon a sudden heat of passion caused by a serious and highly provoking act of the intended victim. The prosecutor continued,

> How about biting him on the hand while he tries to muzzle her?  Is that a serious and highly provoking act?  He admitted in his interview she can't hurt him.  It was his feelings that were hurt. . . .  Affecting the defendant sufficiently to excite an irresistible passion in a reasonable person.  The reasonable person, maybe after strangling her for three minutes, calls 911, renders her aid. The reasonable person doesn't go upstairs . . . .

¶ 54    According to Matthews, the prosecutor misstated the law by focusing on what a reasonable person would do *after* the victim provoked the attack.  The correct inquiry, Matthews says, is whether the victim's provoking act would excite an irresistible passion in a reasonable person.

¶ 55    But a defendant's irresistible passion necessarily arises *after* the intended victim's provoking act; indeed, the latter must cause

25

the former. *See* § 18-3-103(3)(b) (stating the victim's provoking act must "affect[] the defendant sufficiently to excite an irresistible passion"). While the interval is of course short, *see id.*, we see nothing improper in the prosecutor's comment juxtaposing a reasonable person's responsive actions against those by Matthews.

¶ 56    Moreover, even if the prosecutor's comment might have caused some juror confusion, the court correctly instructed the jury regarding (1) the heat of passion defense; and (2) its obligation to follow the rules of law provided by the court, even if an attorney comments on the rules. *See People v. Hogan*, 114 P.3d 42, 56 (Colo. App. 2004). Absent evidence to the contrary, we presume that the jury followed the court's instruction. *People v. Garcia*, 2012 COA 79, ¶ 20.

¶ 57    Matthews also takes issue with the prosecutor's statement that he tried to "muzzle" the victim. But the court sustained defense counsel's objection, the prosecutor refrained from reusing the word, and defense counsel didn't request further relief. Under these circumstances, we decline to review whether the prosecutor's comment constituted misconduct. *See People v. Douglas*, 2012 COA 57, ¶ 65.

## C. Unpreserved Contention

¶ 58     Turning to Matthews' unpreserved contention, he argues that the prosecutor's use of "volitional departure" when arguing against Matthews' heat of passion defense constituted a misstatement of the law.

¶ 59     During closing argument, the prosecutor attempted to draw an analogy between the concept of volitional departure and the interval between Matthews' initial act of strangling the victim and his later act of shooting her. The prosecutor explained that a "volitional departure" occurs "where there was an initial plan and then a change of circumstances resulting in a different plan."

¶ 60     We discern no error, plain or otherwise. The prosecutor didn't characterize "volitional departure" as a *law* that the jury must follow. To the contrary, the prosecutor separately (and accurately) quoted the relevant portions of the heat of passion statute, section 18-3-103(3)(b). The prosecutor instead used "volitional departure" as a metaphor to help explain the *facts*; specifically, the temporal gap between Matthews' initial strangling of the victim for three minutes and his subsequent trip into the house to procure her gun and shoot her. This use of a metaphor wasn't improper. *See People*

27

*v. Allee*, 77 P.3d 831, 837 (Colo. App. 2003) (counsel may employ "metaphorical nuance" in closing argument).

¶ 61    Even if the prosecutor's remarks might have veered into erroneous territory, we can't say that the court's failure to intervene on its own accord rose to plain error. The prosecutor used the "volitional departure" phrase only twice in a closing argument that spanned nearly thirty pages of transcript, the court correctly instructed the jury on Matthews' heat of passion defense, and the evidence was overwhelming that Matthews had a sufficient interval after the victim's alleged provocation to hear the voice of reason and humanity. *See* § 18-3-103(3)(b); *People v. Van Meter*, 2018 COA 13, ¶¶ 32-34. As a result, the "drastic remedy" of reversal under the plain error standard isn't warranted. *Domingo-Gomez*, 125 P.3d at 1055.

D.    Cumulative Error Based on Prosecutorial Misconduct

¶ 62    Because we have determined that the prosecutor didn't commit misconduct in closing argument, we reject Matthews' contention that the cumulative impact of the prosecutor's misconduct requires reversal. *See Howard-Walker v. People*, 2019

28

CO 69, ¶ 25 (cumulative error doctrine requires that the reviewing court identify "multiple errors").

## V.    Disposition

¶ 63    We affirm the judgment.

JUDGE J. JONES and JUDGE LIPINSKY concur.