24CA1683 Peo v Medrano 06-25-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1683
Boulder County District Court No. 22CR889
Honorable J. Keith Collins, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Alonso Luis Medrano,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE YUN
Lipinsky and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 25, 2026

---

Philip J. Weiser, Attorney General, Frank R. Lawson, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Seth Johnson, Alternate Defense Counsel, Pueblo, Colorado, for Defendant-Appellant

¶ 1     Alonso Luis Medrano appeals the judgment of conviction entered after a jury found him guilty of attempted extreme indifference murder, illegal discharge of a weapon, aggravated intimidation of a witness, menacing, and possession of a weapon by a previous offender.  He contends that the district court erred by (1) violating his right to a unanimous verdict; (2) admitting certain photographs; and (3) allowing a police officer to offer expert testimony without being qualified as an expert.  He further contends that (4) the prosecutors engaged in misconduct during opening statement and closing argument and (5) the cumulative effect of these alleged errors deprived him of a fair trial.  We disagree with these contentions and therefore affirm the judgment.

## I.     Background

¶ 2     A jury could have reasonably found the following facts from the evidence introduced at trial.

¶ 3     One evening in June 2022, Medrano, his girlfriend, and an acquaintance, A.R.C., were leaving a restaurant in a strip mall when Medrano spotted someone he knew and feared sitting in a parked car: a man named D.S.  D.S. was a "high-ranking gang member" who Medrano believed had previously "greenlighted" him,

1

meaning that D.S. had issued an order to hurt or kill Medrano on sight. After Medrano, his girlfriend, and A.R.C. initially got into A.R.C.'s car, Medrano got out and went over to talk to D.S. A heated argument broke out, involving loud yelling, racial slurs, and "gang signs." Medrano then returned to A.R.C.'s car, told A.R.C. that D.S. had "disrespected him," and retrieved a gun from the car. He fired five shots, striking D.S.'s car twice. No one was injured.

¶ 4　　　Immediately after the shooting, Medrano pointed the gun at A.R.C. and warned him, "Don't say anything." He then tucked the gun into his waistband, returned to the restaurant, and threatened the patrons inside "not to say anything, or he was going to do something to" them. While making this threat, he grabbed at his waist — a gesture that P.M., one of the customers inside the restaurant, interpreted as a signal that "he can shoot us with the gun."

¶ 5　　　At trial, Medrano asserted that he had acted in self-defense. He testified that he approached D.S. hoping to "talk things out," but D.S. became angry, grabbed a gun, and threatened to kill him. He retreated to A.R.C.'s car and armed himself just as D.S. began driving toward him and pointing a gun out the window. Hearing a

2

"boom," Medrano fired one shot at D.S.'s car and four more into the air to "scare him off."

¶ 6    The jury deliberated on charges of attempted extreme indifference murder against D.S., illegal discharge of a weapon, aggravated intimidation of A.R.C., and menacing of both A.R.C. and P.M.  The jury acquitted Medrano of menacing A.R.C. but found him guilty of the remaining counts.  In a subsequent trial, the jury also found him guilty of possession of a weapon by a previous offender.  The district court sentenced Medrano to a total of thirty years in the custody of the Department of Corrections.

## II.    Unanimity Instruction

¶ 7    Medrano contends that the district court erred by denying his request for a unanimity instruction because the evidence, arguments, and instructions at trial created a risk of a nonunanimous verdict on the aggravated intimidation charge — specifically, some jurors might have found that A.R.C. was the victim while others might have found that P.M. was the victim.  We perceive no error.

## A. Additional Background

¶ 8 As discussed above, the jury heard evidence that, after the shooting, Medrano (1) pointed the gun at A.R.C. and told him, "Don't say anything," and (2) reentered the restaurant and told the people inside, including P.M., "not to say anything," while grabbing at his waist, where P.M. had seen him tuck the gun. Medrano was charged with menacing both A.R.C. and P.M., but he was charged with aggravated intimidation of A.R.C. alone.

¶ 9 The jury instructions on menacing identified A.R.C. and P.M. by name and required the jury to complete separate verdict forms for each of the victims. To establish Medrano's guilt on each count, the jury was required to conclude that Medrano knowingly, by any threat or physical action, placed or attempted to place the respective victims "in fear of imminent serious bodily injury." The jury convicted Medrano of menacing P.M. but acquitted him of menacing A.R.C.

¶ 10 The jury instruction and verdict form for aggravated intimidation, in contrast, did not identify a victim by name, instead referring only to "intimidation of a witness or victim." The instruction set forth the elements of the crime as follows:

1. That the defendant,

2. in the State of Colorado, at or about the date and place charged,

3. by use of a threat, or by committing the crime of harassment, or by committing an act of harm or injury to any person or property,

4. directed to or committed upon a witness or a victim to any crime, a person the defendant believed had been or was to be called or who would have been called to testify as a witness or a victim, a member of the witness' family, a member of the victim's family, a person in close relationship to the witness or victim, a person residing in the same household with the witness or victim, or any person who had reported a crime or who might have been called to testify as a witness to or victim of any crime,

5. intentionally,

6. attempted to, or did: influence the witness or victim to testify falsely or unlawfully withhold any testimony; induce the witness or victim to avoid legal process summoning him to testify; induce the witness or victim to absent himself from an official proceeding; or inflict such harm or injury prior to such testimony or expected testimony, and

7. during the act of intimidating, he was armed with a deadly weapon with the intent, if resisted, to kill, maim, or wound

the person being intimidated or any other person.

¶ 11    As noted above, the jury found Medrano guilty of aggravated intimidation.

¶ 12    Although the aggravated intimidation instruction and verdict form did not name A.R.C., the jury was informed repeatedly throughout the trial that A.R.C. was the victim of this charge.  First, A.R.C. was identified when the district court informed the jury venire of the charges at issue:

> The next count reads that on or about June 8th of 2022, Alonso Luis Medrano, by use of threat, act of harassment, or act of harm or injury to a person or property, directed to or committed upon a person who could be called to testify as a witness to or a victim of crime, namely [A.R.C.], unlawfully and intentionally attempted to or did inflict the harm or injury prior to the testimony or expected testimony.  Further, Alonso Luis Medrano, by the use of force, threats, or intimidation with a deadly weapon, namely a firearm, knowingly put the person being intimidated or any other person in reasonable fear of death or bodily injury, in violation of Section 18-8-705[, C.R.S. 2025].

¶ 13    During her opening statement, one of the prosecutors again identified A.R.C. as the victim of the aggravated intimidation charge:

> Another charge is aggravated intimidation of a witness or a victim. This charge applies to [A.R.C.],[1] and it's for that piece where the Defendant goes to the car, points a gun at him, and tells him not to talk. So a threat that's directed upon a witness where a person is attempting to influence the victim or witness to testify falsely or withhold information. That's what this charge boils down [to], and it's from [A.R.C.]. The person also has to be armed with a deadly weapon.

¶ 14     In closing argument, another prosecutor twice identified A.R.C. as the victim of the aggravated intimidation charge. First, she argued that Medrano "is guilty of aggravated witness intimidation when he pointed a deadly weapon directly at [A.R.C.] and said, don't say anything." Later, she elaborated on the facts specific to the aggravated intimidation charge, again naming A.R.C. as the victim:

> These are all of the elements of aggravated intimidation of a witness, and we've talked about a lot of them.
>
> Much of this comes from [A.R.C.'s] testimony. Now . . . he told you that initially when he had a really quick conversation with law enforcement, in [the restaurant] on June 8th

---

1 In this and the following instance, the prosecutor misstated A.R.C.'s first name by omitting two letters.

he basically didn't say that anything happened. . . .

He did not tell the police that night what happened, because he had just been intimidated and threatened by the Defendant, who put a gun in his face and said, don't say anything, because Mr. Medrano knew that [A.R.C.] was going to be a witness to this offense well before he ever took the stand. And when he pointed that gun, right, a deadly weapon, and tried to influence him to testify falsely or to withhold testimony, that's exactly what he did. He was trying to intimidate Mr. Medrano — or pardon me, [A.R.C.] so that he could cover up what he had just done.

¶ 15    However, one of the prosecutors made two brief statements that appeared to conflate the menacing and aggravated intimidation charges. Specifically, in her opening statement, she said:

This case is about the Defendant's . . . menacing of two different people so that they wouldn't talk about what they had seen.

. . . .

[P.M.] . . . will testify about how terrifying it was to see a shooting happen right at the place that he was eating, and how scary it was when the Defendant came in and threatened him. [P.M.] is one of those people that was initially scared to talk to the police.

And in rebuttal closing argument, she said: "[Medrano] is guilty of menacing and aggravated intimidation of a witness for all of the

8

things that he did to try and cover up and make sure that there wouldn't be people here to tell you what happened on June 8th of 2022."

¶ 16    At the jury instruction conference, defense counsel asked the court to give the following unanimity instruction:

> In order to convict Mr. Medrano of any specific offense, you must unanimously agree that the prosecution has proven his guilt beyond a reasonable doubt as to each element of the count. In addition, you must unanimously agree upon the specific act or acts that Mr. Medrano committed to support each element of each individual act.

Defense counsel did not draw the court's attention to a problem with the aggravated intimidation instruction; rather, she argued that, because the People had named D.S. as the victim of the attempted extreme indifference murder count, "they should not be allowed to, for example, argue that it was a busy street [and] [t]here were people walking." The prosecutor responded that the unanimity instruction was unnecessary because there was no "reasonable likelihood that jurors might disagree on which acts [Medrano] committed." The court agreed with the prosecutor and declined to give the instruction.

9

### B. Governing Law and Standard of Review

¶ 17    A defendant has the right to a jury trial and a unanimous jury verdict.  U.S. Const. amends. VI, XIV; Colo. Const. art. II, §§ 16, 25; *see* § 16-10-108, C.R.S. 2025; Crim. P. 23(a)(8); Crim. P. 31(a)(3). "To that end, in virtually all criminal trials — as in this one — the court instructs the jury that 'the verdict for each charge must represent the considered judgment of each juror, and it must be unanimous.'" *People v. Serna-Lopez*, 2023 COA 21, ¶ 23 (citation omitted).  "But if the prosecution presents evidence of multiple distinct acts, 'any one of which could constitute the offense charged, and the jury could reasonably disagree regarding which act was committed, the district court must either' (1) require the prosecution to elect the act it is relying on to establish the count; or (2) provide a modified unanimity instruction to the jury, explaining that it must 'unanimously agree that the defendant committed the same act or all of the acts.'" *Id.* (quoting *People v. Hines*, 2021 COA 45, ¶ 50).

¶ 18    "We review de novo whether the trial court should have given a modified unanimity instruction." *Id.* at ¶ 27.  "Because the issue is preserved, if the trial court committed error, we will reverse the

10

conviction unless the error was harmless beyond a reasonable doubt." *Hines*, ¶ 48.

## C.    Discussion

¶ 19    Medrano argues that the district court erred by denying his request for a modified unanimity instruction because, in light of the evidence that he threatened both A.R.C. and P.M. to secure their silence, and statements made by the prosecutor, there was a risk that some jurors could have found that A.R.C. was the victim of the aggravated intimidation charge while others could have found that P.M. was the victim.

¶ 20    We conclude that a modified unanimity instruction was not required because the prosecutors clearly and repeatedly informed the jury of the act on which they were relying to establish the count: namely, Medrano's act of pointing a gun at A.R.C. and telling him, "Don't say anything." *See Serna-Lopez*, ¶ 23 (a defendant's right to a unanimous verdict is protected where the prosecution "elect[s] the act it is relying on to establish the count"). In her opening statement, one prosecutor told the jury that the aggravated intimidation charge "applies to [A.R.C.], and it's for that piece where the Defendant goes to the car, points a gun at him, and tells him

11

not to talk." And in closing argument, another prosecutor walked the jury through the elements of the aggravated intimidation charge "from [A.R.C.'s] testimony," explaining exactly how A.R.C.'s account of Medrano's threat fit the definition of aggravated intimidation. Thus, the prosecutors adequately referred to A.R.C. as the victim of the aggravated intimidation charge.

¶ 21 In contrast, the prosecutors did not argue that P.M. was the victim of the aggravated intimidation charge. Although one prosecutor remarked that Medrano was guilty of "menacing and aggravated intimidation of a witness for all of the things that he did to try and cover up and make sure that there wouldn't be people here to tell you what happened," this statement was not directly tied to P.M. At no point was P.M.'s name or testimony directly linked to the aggravated intimidation charge.

¶ 22 To the extent Medrano argues that the district court erred by failing to sua sponte amend the aggravated intimidation jury instruction to explicitly name A.R.C. as the victim, we review this claim for plain error. "Plain error addresses error that is obvious and substantial and that so undermines the fundamental fairness

12

of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *People v. Smith*, 2018 CO 33, ¶ 24.

¶ 23    A simple variance occurs "when the evidence presented at trial proves facts materially different from those alleged in the charging document." *Id.* at ¶ 25. Omitting a specific victim from a jury instruction, when the charging document names a victim, may constitute a simple variance. *Id.* at ¶¶ 10, 25; *People v. Rice*, 198 P.3d 1241, 1246 (Colo. App. 2008) (finding a simple variance where "the jury instructions removed the named victim from the offense of computer crime"). "An error in jury instructions, such as a simple variance, generally does not rise to the level of plain error unless a review of the entire record establishes a reasonable possibility that the improper instruction contributed to the defendant's conviction." *Smith*, ¶ 25.

¶ 24    *People v. Simmons*, 973 P.2d 627 (Colo. App. 1998), and *Smith* provide useful guidance. In *Simmons*, a division of this court found plain error when the prosecution charged the defendant with menacing a particular victim, but the evidence, jury instruction, and arguments enabled the jury to convict him without unanimously agreeing on the victim. 973 P.2d at 629. Specifically,

the evidence suggested the victim could have been either the defendant's sister's boyfriend or the defendant's mother, the jury instruction did not name a victim, and the prosecutor argued that it *did not matter* who the victim was. *Id.* The division concluded that the lack of a named victim in the instruction and "the prosecutor's comments . . . invit[ing] the jury to convict without regard to the identity of the victim" made it "impossible to determine whether the jury unanimously agreed as to a particular victim." *Id.* at 630.

¶ 25    More recently, in *Smith*, the supreme court evaluated whether the simple variance caused by the omission of the named victim from a jury instruction resulted in an obvious risk of a nonunanimous verdict. *Smith*, ¶¶ 10, 25-26. The prosecution charged the defendant with domestic violence-related menacing and named his girlfriend as the victim; on appeal, the defendant argued that the jury instruction, which did not identify the victim, created a risk of a nonunanimous verdict because some jurors might have decided that a nearby police officer, not the girlfriend, was the victim. *Id.* at ¶¶ 4, 10. The court determined that there was no such obvious risk because (1) the charges read to the venire identified the girlfriend as the victim of the count titled "Menacing-

14

domestic violence related"; (2) the prosecutor consistently described the menacing as occurring when the defendant pointed his gun at the girlfriend; (3) the defendant admitted to pointing the gun at the girlfriend, allegedly in self-defense; (4) the jury instructions labeled the count as "Menacing-domestic violence related"; and (5) a special interrogatory asked the jury to determine whether the prosecution had proved that the menacing was an act of domestic violence. *Id.* at ¶¶ 27-31. Thus, the court concluded there was no risk that any juror found that the police officer, and not the girlfriend, was menaced. *Id.* at ¶ 26.

¶ 26 This case is more analogous to *Smith* than *Simmons*. Here, as in *Smith*, both the district court and the prosecutors consistently identified A.R.C. as the victim. The prosecutors did not argue that P.M. could be the victim of the aggravated intimidation charge or that it did not matter who the victim was. Accordingly, viewing the record as a whole, we cannot say that the risk of nonunanimity arising from the lack of an identified victim in the aggravated intimidation instruction was so obvious that the district court should have been able to avoid it without the benefit of an objection. *See Smith,* ¶ 33.

15

¶ 27    It is true that the jury's verdict acquitting Medrano of menacing A.R.C. could be viewed as inconsistent with its verdict convicting him of aggravated intimidation against A.R.C.  But as the People note, the jury may have mistakenly believed that menacing was a lesser included offense of aggravated intimidation.  Alternatively, the jury may have believed that A.R.C. — who knew Medrano — was not placed in fear of "imminent" harm (as required for menacing) but rather feared he would be harmed if he "resisted" Medrano's order to remain silent (as required for aggravated intimidation).

¶ 28    Accordingly, we conclude that the district court did not err by declining to give a modified unanimity instruction and did not plainly err by failing to amend the aggravated intimidation instruction to identify A.R.C. as the victim.

### III.    Admission of Photographs

¶ 29    Medrano contends that the district court erred by admitting photographs of D.S.'s car taken approximately twenty-four hours after the shooting.  We disagree.

16

## A.    Additional Background

¶ 30    D.S. did not report the shooting to police, but investigators identified him through a surveillance video and records from a nearby marijuana dispensary in which he scanned his driver's license shortly before the incident.

¶ 31    The day after the shooting, police contacted D.S. at his house. They photographed and searched his car, recovering a bullet fragment from the rear passenger compartment. The photographs of D.S.'s car showed a small hole in the front windshield, shattered glass on the dashboard, and a deformity in the rear passenger side door.

¶ 32    D.S. declined to cooperate with the prosecution. Before trial, Medrano objected to admitting photographs of D.S.'s car without foundational testimony from a witness with personal knowledge that the damage shown was caused by the shooting at issue in this case. The court ruled that the photographs would be admitted:

> Obviously, they can testify that there's a shattered windshield and whatever else the car condition is, but without [D.S.] to say it occurred in this shooting as opposed to it occurred prior, who knows when it occurred, right?

17

So I think the pictures of the car can come in and/or if there's a video of the car, without any comments, can come in.

¶ 33 At trial, several witnesses testified that Medrano fired shots or pointed his gun at D.S.'s car:

- A.R.C. testified that he saw Medrano fire at D.S.'s car.

- The restaurant manager testified that she saw Medrano point a gun "[t]owards the next parking area" after the first several shots.

- A bystander testified that she saw Medrano point a gun at D.S.'s car.

- Another bystander testified that "it looked like [Medrano] was pointing the gun at the person they had been arguing with."

- Medrano testified that he fired one shot at D.S.'s car and four shots into the air to scare D.S.

B. Governing Law and Standard of Review

¶ 34 When "the relevance of evidence depends upon the fulfillment of a condition of fact, . . . the rules of evidence require the trial court to admit the evidence upon or subject to the introduction of evidence sufficient to support a finding by the jury of that condition

of fact." *People v. Brown*, 313 P.3d 608, 613 (Colo. App. 2011) (quoting *People v. Summitt*, 132 P.3d 320, 331 (Colo. 2006) (Coats, J., concurring in part and in the judgment)); *see* CRE 104(b). "Only if there is no evidence from which reasonable jurors could find the condition of fact should the challenged evidence be rejected as irrelevant." *Brown*, 313 P.3d at 613 (quoting *Summitt*, 132 P.3d at 331 (Coats, J., concurring in part and in the judgment)); *see also Burlington N. R.R. Co. v. Hood*, 802 P.2d 458, 468 (Colo. 1990) ("Only if the proffered evidence, considered in its total context, is manifestly insufficient to sustain a reasonable finding by the jury of the conditional fact should the trial court rule the evidence inadmissible.").

¶ 35    We review a district court's evidentiary decisions for an abuse of discretion. *People v. Elmarr*, 2015 CO 53, ¶ 20. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or when it is based on a misapprehension of the law. *Id.*

### C.    Discussion

¶ 36    Medrano argues that, because no witness directly testified that the damage shown in the photographs of D.S.'s car occurred during

the shooting, the conditional relevance of the photographs under CRE 104(b) was never met. Accordingly, he argues, the district court abused its discretion by admitting them.

¶ 37 Although it is true that no witness testified that the shooting caused the damage depicted in the photographs, we disagree with Medrano's assertion that there was "no evidence from which reasonable jurors" could draw that conclusion. *Brown*, 313 P.3d at 613. Medrano admitted to firing at D.S.'s car, and witness testimony supported the inference that he did so more than once. This testimony, combined with the recovery of a bullet fragment in the passenger compartment, reasonably connected the damage to the windshield and door with those gunshots. The presence of broken glass further suggested that the damage was recent. Considered in context, there was a sufficient factual basis for the jury to connect the damage shown in the photographs of D.S.'s car to the shooting the day before. *See People v. Garner*, 806 P.2d 366, 371 (Colo. 1991) ("[I]n resolving [CRE 104(b)] questions[,] the judge merely determines as a preliminary matter whether the foundation evidence is sufficient to support a reasonable finding by a jury of the fulfillment of the condition. If such a *prima facie* showing is

made, the trial court admits the evidence for the jury's consideration." (citation omitted)).

¶ 38 We therefore conclude that the district court did not abuse its discretion by admitting the photographs.

## IV. Admission of Officer's Testimony

¶ 39 Medrano contends that the district court erred by allowing a police officer to provide expert testimony without being qualified as an expert. Specifically, he argues that the officer should not have been permitted to testify that the projectile found in D.S.'s car was a "bullet." We conclude that Medrano waived this argument.

## A. Additional Background

¶ 40 At trial, the prosecutor showed a police officer a photograph of the small metal object found in D.S.'s car and asked if the officer knew "what we're looking at here." The officer responded that it was a "projectile." After a few more questions and answers establishing where the projectile was found, the prosecutor then asked, "[W]hen we're calling it a projectile, what does that appear to be to you?"

¶ 41 Defense counsel objected, arguing that the prosecutor had not laid a sufficient foundation and that the officer's response would

call for expert testimony. The prosecutor countered that it was "an appropriate lay opinion from this officer as to what he believes that particular item is." The court sustained the objection as to foundation and invited the prosecutor to "lay more foundation." The prosecutor then elicited from the officer that he had training with firearms, carried a firearm regularly, had "seen a projectile" before, and was a firearms instructor.

¶ 42 Defense counsel objected again, this time arguing that the prosecutor was bolstering the officer's testimony. After some back and forth, defense counsel withdrew her objection to the prosecutor's original question and agreed that the officer could offer a lay opinion that the projectile was a bullet, so long as the prosecutor did not elicit further testimony about the officer's status as a firearms instructor. The following exchange ensued:

> [PROSECUTOR:] Officer, I'm going to rephrase my earlier question. Have you seen projectiles sort of similar to this in the past?
>
> [OFFICER:] Yes.
>
> [PROSECUTOR:] And what, in your opinion, is that when —
>
> [OFFICER:] It is the back of a copper — copper-coated projectile.

[PROSECUTOR:] When you say projectile, is that a technical term?

[OFFICER:] That's — I guess.

[PROSECUTOR:] This is what you call it.

[OFFICER:] Yeah.  It's just how I've always kind of known it.

[PROSECUTOR:] Okay.  If I called it a bullet, would I be right or would I be wrong?

[OFFICER:] You'd be correct.

### B.    Discussion

¶ 43    The People contend that Medrano waived this argument when defense counsel withdrew her objection to prevent further testimony about the officer's status as a firearms instructor.  We agree.

¶ 44    We review de novo whether a claim is waived.  *People v. Garcia*, 2024 CO 41M, ¶ 29.  Waiver is the intentional relinquishment of a known right.  *Forgette v. People*, 2023 CO 4, ¶ 28.  A waiver may be explicit when, for example, "a party expressly abandons an existing right."  *Id.*  A waiver may be also implied when the party "engages in conduct that manifests an intent to relinquish a right or privilege or acts inconsistently with its assertion."  *Id.*  For a waiver to be implied, the record need only show that a defendant or their "counsel made a conscious decision to forego raising a claim [or an

23

objection] for strategic or other reasons." *Cardman v. People*, 2019 CO 73, ¶ 18 n.6.

¶ 45 Here, defense counsel explicitly withdrew her objection for strategic reasons. Although she initially objected to the officer's testimony, she later withdrew her objection and agreed that the officer could offer a lay opinion that the projectile was a bullet, so long as the prosecutor did not elicit further testimony about the officer's status as a firearms instructor. Under these circumstances, Medrano waived the issue by withdrawing it from the court's consideration. *See In Interest of L.B.*, 2017 COA 5, ¶ 51 ("A waiver occurs when a party removes an issue from the court's consideration.").

¶ 46 Accordingly, we do not address this contention. *See Garcia*, ¶ 28.

## V. Prosecutorial Misconduct

¶ 47 Medrano contends that the prosecutors committed misconduct by (1) referring to the damage to D.S.'s car as "bullet hole[s]"; (2) drawing certain inferences from those bullet holes; (3) misstating a witness's testimony; and (4) expressing an opinion that Medrano was lying. Only his second contention is preserved. After setting

forth the governing law and standard of review, we address each contention in turn.

## A. Governing Law and Standard of Review

¶ 48 We engage in a two-step analysis when reviewing claims of prosecutorial misconduct. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).

¶ 49 First, we determine whether the conduct was improper based on the totality of the circumstances. *Id.* We consider the context of the argument as a whole and view it in light of the evidence before the jury. *People v. Samson*, 2012 COA 167, ¶ 30. "A prosecutor has wide latitude to make arguments based on facts in evidence and reasonable inferences drawn from those facts." *People v. Strock*, 252 P.3d 1148, 1153 (Colo. App. 2010), *overruled on other grounds by*, *People v. Kennedy*, 2025 CO 63. The prosecutor may also "employ rhetorical devices and engage in oratorical embellishment." *Samson*, ¶ 31. Because "arguments delivered in the heat of trial are not always perfectly scripted," we give the prosecutor the benefit of the doubt when their remarks are "ambiguous or simply inartful." *Id.* at ¶ 30. But the prosecutor may not misstate the evidence or the law. *Id.* at ¶ 32; *People v.*

*Weinreich*, 98 P.3d 920, 924 (Colo. App. 2004), *aff'd*, 119 P.3d 1073 (Colo. 2005).

¶ 50   Next, if we identify misconduct, we determine whether it warrants reversal under the applicable standard of review.  *Wend*, 235 P.3d at 1096.  We review preserved claims of prosecutorial misconduct that do not "specifically and directly offend a constitutional right" for harmless error.  *People v. Licona-Ortega*, 2022 COA 27, ¶ 87.  Under the harmless error standard, "we will disregard the error unless it 'substantially influenced the verdict or affected the fairness of the trial proceedings.'"  *Id.* (quoting *Hagos v. People*, 2012 CO 63, ¶ 12).  And we review unpreserved claims of prosecutorial misconduct for plain error.  *Id.* at ¶ 88.  To constitute plain error, the misconduct "must be flagrant or glaring or tremendously improper, and it must so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction."  *Id.* (quoting *Weinreich*, 98 P.3d at 924).  "Prosecutorial misconduct in closing argument rarely constitutes plain error."  *Weinreich*, 98 P.3d at 924.

## B.     Bullet Holes

¶ 51     During her opening statement, while describing the police investigation, the prosecutor said that, "Ultimately, the investigation led them to finding [D.S.'s car] that had this bullet hole in the front windshield and another bullet hole on the side of the vehicle."  Defense counsel did not object.

¶ 52     Medrano argues that it was improper for the prosecutor to refer to the damage as "bullet hole[s]" because "[t]here was a complete absence of admitted evidence" supporting that inference. But while it is true that no witness used those exact words — the officer described a "hole" in the windshield and a "deformity" in the rear passenger side door — other evidence supported the inference that bullets caused the damage.  Specifically, police found five spent cartridges in the parking lot near where Medrano allegedly fired five rounds, as well as a bullet fragment inside the car, and multiple witnesses described Medrano pointing a gun or firing at the car.  Medrano himself admitted that he fired a shot at the car. Accordingly, the prosecutor's reference to "bullet hole[s]" was a fair inference from the evidence and was not an improper argument based on the admitted evidence.  *See People v. Douglas*, 2012 COA

57, ¶ 64 (a party may use its opening statement to discuss the facts the party intends to prove at trial).

### C. Inferences from Bullet Holes

¶ 53 During closing argument, the prosecutor said that Medrano "fired multiple times at [D.S.], and there are multiple bullet holes to prove it." Defense counsel objected, but the court overruled the objection, noting that "[i]t's closing arguments." The prosecutor then referenced photographs depicting the damage to D.S.'s car and made the following argument:

> That's a bullet hole. That's the inside door, also a bullet hole, right? Same one as that, just on the other side of the door. That is also a bullet hole. That bullet hole goes into the front of that windshield and actually into the passenger side of the car. This bullet hole right here also has a direction to it. You can kind of use your common sense just by looking at this hole and understanding a little bit about physics, and know that if this is, sort of, that back seat of the car, this bullet enters from behind that vehicle kind of off to the side and from behind. This did not come into the car, sort of, from the front. So if Mr. Medrano was firing directly at the vehicle, it might explain that right there. And it absolutely does, because he fired that directly into the windshield. But it doesn't describe this one, because this bullet hole came from the, sort of, behind the vehicle on the righthand side, exactly where it would have been placed and

how it would have been placed if Mr. Medrano was firing at the Audi [D.S.'s car] not as it was coming towards him but actually after it had turned and was pulling out onto the roadway, onto the main street. That also helps prove the directionality of that bullet hole on the inside of the vehicle.

¶ 54     Medrano argues that the prosecutor's interpretation of the damage to D.S.'s car "went well beyond drawing rational inferences from the evidence and into the realm of expert shooting reconstruction testimony." Although this portion of the prosecutor's argument is not entirely clear, we agree that she may have overstated the inferences from the evidence. However, in light of the evidence that Medrano fired multiple times at D.S.'s car, we conclude that the error did not substantially influence the verdict or affect the fairness of the trial proceedings. *See Licona-Ortega*, ¶ 87.

## D.     Bystander Testimony

¶ 55     At trial, one of the bystander witnesses described hearing gunshots and seeing Medrano pointing a gun at D.S.'s car. As relevant here, she testified as follows:

> [PROSECUTOR:] So the guy with the pizza eventually got into the Audi [D.S.'s car]. And then . . . did the Audi go anywhere?

29

[BYSTANDER:] Yes. It backed out and exited the parking lot.

[PROSECUTOR:] Okay. When, in relation to that, did the shooting start?

[BYSTANDER:] They pulled out of the parking spot and . . . they were getting ready to turn out of the parking lot. And I believe, as I recall, that was when the first shot was made.

. . . .

[PROSECUTOR:] Do you remember . . . when those shots started going off?

[BYSTANDER:] I was . . . opening the car door, getting into the car as soon as that happened.

[PROSECUTOR:] Okay. Did you actually see the person who was shooting a gun?

[BYSTANDER:] I didn't see him shoot the gun, no. But I did hear it go off.

. . . .

[PROSECUTOR:] Do you remember seeing where, which direction the gun was pointed?

[BYSTANDER:] It was pointed at the gold Audi.

¶ 56    During closing argument, the prosecutor made the following

reference to the bystander's testimony:

> You heard from [the bystander] who was getting into her car. . . . [S]he's getting into her car when she starts seeing or hearing gunshots. And she sees the Defendant in his

red ball cap firing not into the air but at a
vehicle as it was pulling out of the parking lot.

¶ 57    Medrano argues that the prosecutor misstated the bystander's testimony because she never said she saw Medrano "firing"; rather, she said she heard the gunshots as she was getting into her car and then saw Medrano pointing the gun at D.S.'s car.  While the prosecutor's summary was generally accurate, the use of "firing" was a misstatement.  We cannot agree, however, that this discrepancy was so flagrant or glaring or tremendously improper as to constitute plain error.  *See Licona-Ortega*, ¶ 88.  Indeed, in the previous sentence, the prosecutor qualified her own recollection by saying that the bystander started "seeing or hearing gunshots." "Hearing" was correct.

¶ 58    We thus discern no reversible error.

### E.    "Suspend Disbelief"

¶ 59    During closing argument, the prosecutor challenged Medrano's defense that he had a "reasonable belief of imminent serious bodily injury" before the shooting.  The prosecutor argued that Medrano's claim did not make sense because (1) he initially approached D.S.; (2) no other witness testified that D.S. had a

31

weapon; and (3) he had already retreated from the confrontation before retrieving the gun. In commenting on Medrano's theory of defense, the prosecutor said, "You really have to suspend disbelief to believe what the Defendant is telling you . . . ."

¶ 60 Medrano argues that the prosecutor's comment about suspending disbelief was an improper expression of personal opinion about his truthfulness. *See Wilson v. People,* 743 P.2d 415, 418 (Colo. 1987) ("[I]t is improper for counsel to express his or her personal belief in the truth or falsity of testimony . . . ."). But read in context, the comment was a direct response to Medrano's theory of the case.

¶ 61 Rather than expressing a personal opinion, the prosecutor drew the jurors' attention to the evidence by emphasizing what they had heard during the trial. Because "counsel may . . . draw reasonable inferences from the evidence as to the credibility of witnesses," *id.,* the prosecutor's comment was not improper. *See People v. Collins,* 250 P.3d 668, 678 (Colo. App. 2010) (the prosecutor's rebuttal comment that the defendant's theory of reasonable doubt was "absurd" did "nothing more than suggest to the jury that [the] defendant's theory as to why the jury should find

32

a reasonable doubt was so unlikely as to strain credibility");

*People v. Ramirez*, 997 P.2d 1200, 1211 (Colo. App. 1999) (concluding that it was not improper to characterize a defense argument as "blowing smoke" when this phrase was used to assert that the evidence supporting the defendant's innocence lacked substance), *aff'd*, 43 P.3d 611 (Colo. 2001).

## VI.    Cumulative Error

¶ 62    Finally, Medrano contends that, even if the individual errors do not require reversal, their cumulative prejudicial impact does. "For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not." *Howard-Walker v. People*, 2019 CO 69, ¶ 25.  Here, although we identified two errors, there is no reversible cumulative error because — even viewed in combination — those errors did not substantially prejudice Medrano's right to a fair trial.  *See People v. Conyac*, 2014 COA 8M, ¶ 152 ("Here, although we have found some errors, because we do not perceive that they substantially prejudiced [the] defendant's right to a fair trial, there is no reversible cumulative error.").

## VII.   Disposition

¶ 63   We affirm the judgment.

JUDGE LIPINSKY and JUDGE SCHUTZ concur.